PAUL HARDEMAN, INC., ET AL v. J. I. HASS CO., INC., ET AL

5-4852                                   439 S.W. 2d 281

Opinion Delivered April 7, 1969
[Rehearing denied May 5, 1969.]

560

*Wright, Lindsey & Jennings* for appellants.

*Rose, Meek, House, Barron, Nash & Williamson* for appellees.

LYLE BROWN, Justice.    Plaintiffs below were Paul Hardeman, Inc., Fischbach and Moore, Inc., and Morrison-Knudsen, Inc., prime contractors under a joint venture in the construction of missile launch facilities in White County.    The defendant J. I. Hass Company, Inc. was a painting subcontractor for the joint venture or prime contractor.    William Turpin, an employee of Hass, was injured when he fell while painting near the top of a vent pipe.    The prime contractor admitted negligence in not properly securing the vent pipe at its base and paid Turpin $50,000.    Plaintiffs sued Hass under a contract of indemnity for the amount paid Turpin. (The Uniform Joint Tortfeasors Act is not involved.) Employers Mutual Liability Insurance Company of Wisconsin paid Turpin workmen's compensation and it intervened, seeking recoupment from the prime contractor; Turpin's release to the prime contractor reserved intervenor's right to maintain such an action. The trial court held (1) that Hass was free of any negligence contributing to cause Turpin's injuries, (2) that the contract of indemnity did not obligate Hass under the circum-

stances to indemnify the prime contractor, and (3) that the stipulated amount due Employers Mutual would bear interest from the date of entry of judgment and not from an earlier date when the debt was stipulated to be owed. Plaintiffs appeal on the first two holdings and Employers Mutual appeals with respect to the date interest should have started.

The prime contract held by the joint venture called for its installation of a three-inch vent pipe to be set vertically in a concrete pad or base. When the concrete was poured the three-inch pipe was not available; so, with the approval of the United States Corps of Engineers, a four-inch sleeve or collar was placed in the concrete base. It was agreed that the three-inch pipe would be inserted in the sleeve to a depth of eighteen inches and welded. When the three-inch pipe arrived it was inserted but only to a depth of a few inches. Instead of welding the two pipes a type of caulking material was inserted in the space between the pipes. The pipe was 27' 10'' in height above the pad. The prime contractor awarded J. I. Hass Company a painting contract which included this particular pipe. Hass furnished its painter, William Turpin, the equipment with which to do the painting. In the painting trade that equipment is called stirrup and saddle. Two buckles are tied on the ends of a rope and are used for foot stirrups. That rope is placed around the center of the pipe. Another rope is tied to a two-by-twelve board and it is used for a saddle. That rope is likewise attached to the pole and is thrown and tied off at a point some four feet from the top of the pole. The top four feet is painted by the use of a long brush so the painter never climbs higher than the tie-off. Turpin had painted approximately four feet when the pipe came loose at the base and he fell to the ground.

That the prime contractor was negligent in the erection of the pipe is not here questioned. This suit was instituted on the theory that as a matter of law the con-

tract of indemnity executed by Hass obligated it to reimburse the prime contractor in full for the latter's payment to Turpin. In the alternative it was asserted that Hass would unquestionably be liable in proportion to its negligence in allegedly failing to provide Turpin with safe equipment for the performance of his task. Both sides presented their evidence on the alleged negligence of Hass. The trial court concluded that Hass was entitled to an instructed verdict. Secondly, it was held that Hass was not obligated to reimburse the prime contractor for sums it was forced to pay as a result of an accident caused solely by the prime contractor's negligence. We proceed to examine the propriety of the court's holdings on those two points.

In testing the granting of a directed verdict the rule has been many times stated and ofttimes with a slight variation. A typical statement of the rule is found in *Barrentine* v. *The Henry Wrape Co.*, 120 Ark. 206, 179 S.W. 328 (1915):

> In determining on appeal the correctness of the trial court's action in directing a verdict for either party, the rule is to take that view of the evidence that is most favorable to the party against whom the verdict is directed, and where there is any evidence tending to establish an issue in favor of the party against whom the verdict is directed, it is error to take the case from the jury.

We have no intention of deviating from the rule just stated; however, it has been some time since we have pointed up the meaning of the term "any evidence." The term has long been recognized to mean "evidence legally sufficient to warrant a verdict." *Catlett* v. *Railway Company*, 57 Ark. 461, 21 S.W. 1062 (1893). To be legally sufficient it must be substantial; and substantiality is a question of law. *St. Louis S.W. Ry. Co.* v. *Braswell*, 198 Ark. 143, 127 S.W. 2d 637 (1939).

The only witness offered by the prime contractor was Ben Hopkins. His qualifications in the field of

structural engineering were admitted. We summarize the significant portions of his direct testimony in the following paragraph:

A procedural method of painting a pipe of three inches or less, over 24 feet high is to place a painter's extension ladder on each side of the pole. A lock is placed at the top section of the extension ladders, locking them together. There is no contact between the pole and the ladders. The bottom of the ladders is placed four feet from the bottom of the pole. Another method is to drop a painter by a swing that is hung from a crane lift. That is not as economical as the ladder method. With the stirrup and saddle method, the weight and movement of the painter creates a stress at the point of anchorage. If a painter and his rig weigh 200 pounds and he is at the top of a pole 27' 10" in height, is suspended outside the pipe and some twelve inches away from it, with his legs not wrapped around the pipe, he would create a "live and dead load of 19,-082 pounds per square inch" on a three-inch pipe. Pipe of the type at hand is not used by engineers for building purposes past a criteron of 18,000 pounds of stress per square inch. Actually the yield point of that type pipe is set by manufacturers between forty-five and sixty thousand pounds. Design engineers use the eighteen thousand pound criteron as a cushion for safety. He asserted that any unusual movements made by Turpin while in the painting process would be a critical factor.

On cross-examination it was brought out that Mr. Hopkins was not aware that the three-inch pipe was inserted from two to three inches into the four-inch pipe, that the pipes were not welded, and that caulking material was placed in the space between the pipes. When advised of that situation he conceded that Turpin was bound to fall because of the faulty installation. And, although he did not deviate from his opinion that the saddle and stirrup method is poor procedure, he concluded that he had no criticism of Hass for permitting Turpin to climb the pole with that method. In reaching

that conclusion he considered the fact that other poles properly constructed had been climbed by the same method and without incident.

Hopkins' opinion that the stirrup and saddle method was unsafe in this situation is fatally weakened by some of his assumptions which are not supported by the record. He conceded that the strength of the pipe was on a "hairline" between being safe and hazardous. For that reason his assumptions become all the more important. Hopkins calculated the stress at the anchor point from the very top of the pole; the uncontradicted proof showed that the painter tied off his climbing rope from three to four feet below the top. In computing the stress at the anchor point, Hopkins assumed that Turpin and his rig created a weight of 200 pounds; there is no evidence in the record to support that assumption. He assumed that the painter was suspended some twelve inches from the pole with his legs dropped downward; the evidence showed that the saddle was against the pole and the painter's legs were wrapped around the pole. Added to the unsupported assumptions is the fact that there was no proof of any unusual movements by Turpin, which it is admitted would have been significant. Another factor which the trial court probably considered of some importance is that Hopkins revealed that the yield point set by manufacturers is from forty-five to sixty thousand pounds, as opposed to his estimated stress load placed on the pipe by Turpin of 19,082 pounds.

Of course any negligence on the part of Hass in furnishing Turpin with what Hopkins considered to be an improper set of equipment would not be enough to make Hass liable. The second and vital step in the chain of proof would be a showing preponderantly that the equipment used was a proximate cause of the fall. In that respect we consider the proof to be entirely lacking. In fact Hopkins stated that the pipe fell because of defective installation.

Secondly, the prime contractor claims a right to judgment against J. I. Hass Company as a matter of law. That is on the theory that under the terms of the subcontract, Hass agreed unconditionally to indemnify the prime contractor for any and all liabilities owed by the prime contractor arising out of any accident occurring as a result of the subcontractor's activities; and that the obligation was undertaken by the agreement irrespective of fault. The indemnity provision of the subcontract is as follows:

9. Subcontractor agrees to save and indemnify and keep harmless Contractor, Owner and Architect-Engineer against all liability, claims, demands or judgments for damages arising from accidents to persons or property occasioned by Subcontractor, his agents or employees, and against all claims or demands for damages arising from accidents to Subcontractor, his agents or employees, whether occasioned by Subcontractor or his agents or his employees; and Subcontractor will defend any and all suits brought against Contractor, Owner, or Architect-Engineer, and all of them, on account of any such accidents, and will pay any judgments rendered in such suits, and will reimburse and indemnify Contractor, Owner or Architect-Engineer and any of them, for all expenditures, or expenses, including attorney fees and court costs, had or incurred by reason of such accidents. Contractor shall, at its option, have full control of any defense of any such suits, and contractor shall at all times have the option of choosing the attorney or attorneys to perform the professional services involved.

On the question of indemnity we are cited one case from our jurisdiction, *C & L Rural Elec. Coop. Corp.* v. *Kincaid*, 221 Ark. 450, 256 S.W. 2d 337 (1953). There the indemnity provision is so different from the one at bar that *Kincaid* is of no aid. Many decisions are cited by appellants and appellees from other jurisdictions supporting their respective theories. The decided

weight of authority favors appellees. The precise question is whether this indemnity provision obligates the subcontractor to indemnify the prime contractor for damages arising out of the negligence of prime contractor which was the proximate cause of Turpin's injuries. The intention of Hass to so obligate itself must be expressed in clear and unequivocal terms and to the extent that no other meaning can be ascribed. 41 Am. Jur. 2d, Indemnity § 15. Where an injury is caused by the sole negligence of the indemnitee many courts, in interpreting the indemnity contract, predicate their interpretation on the theory that such a liability would be unusual and harsh; consequently, the courts endeavor to relieve the indemnitor of liability to the negligent indemnitee. 175 ALR, p. 32, § 18.

We examine the provisions of the indemnity paragraph. There are three areas in which liability is imposed on the subcontractor:

1. He is liable for damages arising from accidents to persons or property *occasioned* by him, his agents or employees;

2. He must indemnify for damages chargeable to the prime contractor as a result of injury or damage to the subcontractor, his agents or employees, whether *occasioned* by the subcontractor, or his agents or employees; and

3. The subcontractor must at his expense defend any suits brought against the prime contractor as the result of any accident *occasioned* by the subcontractor, his agents or employees.

The meaning of the words "occasioned by" holds the key to a proper interpretation of the contract.

As used in this contract the verb "occasioned" could have had one of two meanings. In a number of instances it is said that the cause of an injury is that which

actually produces it, whereas the occasion is that which provides an opportunity for the casual agency to act. *Merlo* v. *Public Service Co.*, 45 N.E. 2d 665 (Ill. 1942); *Barney* v. *Adcock*, 75 N.W. 2d 683 (Neb. 1956). On the other hand most dictionaries list "caused" as a synonym for "occasioned" and there are those cases in which the two words are said to be synonymous. For example, *Union Gold Mining Co.* v. *Crawford*, 69 P. 600 (Colo. 1902); *People* v. *Halbert*, 248 P. 969 (Calif. 1926); and *Smart* v. *Raymond*, 142 S.W. 2d 100 (Mo. 1940).

In view of the uncertainty of the manner in which "occasioned by" was used in this contract, we cannot say the subcontractor expressed an intent, in words clear and unequivocal, to bind itself for the negligence of the prime contractor. That is especially true in face of the fact that it would require no extraordinary skill in draftsmanship to so bind the subcontractor in words and phrases of absolute certainty.

There remains for consideration the cross-appeal of Employers Mutual. At the trial on October 26, 1965, the prime contractor stipulated its liability to Employers Mutual for workmen's compensation benefits paid Turpin. Through no fault of the parties or the court the formal judgment was not entered until August 3, 1967. That judgment allowed interest to Employers Mutual from the latter date. The carrier is entitled to interest from the date of the stipulation. *Kincade* v. *C. & L. Rural Elec. Coop.*, 227 Ark. 321, 299 S.W. 2d 67 (1957).

Affirmed on direct appeal; reversed and remanded on cross-appeal.

Fogleman, J., disqualified and not participating.