# GENERAL ELECTRIC COMPANY *v.* Lila GILBERT

CA 01-311                                                65 S.W.3d 892

Court of Appeals of Arkansas
Division II, III, and IV
Opinion delivered January 30, 2002

*Snellgrove, Langley, Lovett & Culpepper*, by: *Todd Williams*, for appellant.

*Blackman Law Firm*, by: *Keith Blackman*, for appellee.

WENDELL L. GRIFFEN, Judge. This appeal arises from a wrongful-discharge suit. Appellee, Lila Gilbert, was discharged by her former employer, appellant, General Electric Company. A jury found that appellant had wrongfully discharged appellee in violation of the public policy of Arkansas because she was seeking workers' compensation benefits. The jury awarded her $79,525.44, plus unspecified pension benefits. The trial court determined appellee's pension loss to be $1,965.45. Appellant appeals from the denial of its motion for a directed verdict and from the award of damages for pension benefits. We affirm the award of lost wages because the evidence shows that appellee presented a *prima facie* case of wrongful discharge, but the employer did not prove that it had a legitimate, nondiscriminatory basis for her discharge. However, we reverse with regard to the award of pension benefits because appellee did not specifically prove the amount of pension benefits to which she was entitled.

Appellee began working for appellant in 1973. She was diagnosed with carpal-tunnel syndrome and had surgery for the same in 1992. However, she continued to experience problems with her hands after surgery, and required further treatment. She was terminated in 1993 for being absent for ten days without providing a

medical excuse. Appellee eventually settled her workers' compensation claim against appellant for $6,500 in 1995. She filed a suit for wrongful discharge in May 1996.[1] The case proceeded to trial and appellant now appeals from the verdict and award of damages rendered in the subsequent trial.

Appellee began working for appellant in 1973 as an assembly-line worker. In August 1992, she was diagnosed as having carpal-tunnel syndrome in her left hand. At that time, Dr. C.A. McDaniel, an orthopedic doctor, ordered appellee to avoid work involving repetitive motion. In October 1992, she had carpal-tunnel-release surgery performed on that hand. Appellee received workers' compensation benefits, including payment for her medical treatment. After her surgery, a Dr. Jobe returned her to work with a ten-pound weight restriction and noted that she was still experiencing ongoing mild to moderate right carpal-tunnel symptoms. She returned to work wearing splints, but was unable perform the job she had been performing. Appellant moved her to a "winding" position because the work was less repetitive.

Appellee saw Dr. McDaniel again in May 1993. He ordered her to avoid repetitive motion work and heavy lifting until she saw Dr. Wood the following week (Dr. Wood replaced Dr. Jobe). Dr. Wood noted that appellee stated that she worked at a position with the minimal amount of repetitive motion possible at her company. He also ordered her to continue to perform light duty work. In June 1993, appellee still suffered pain in her left hand and arm and was diagnosed with possible carpal-tunnel syndrome in her right hand.

Appellee testified that she told Jean Nall, appellant's union relations specialist, that the winding job was too repetitive, but that Nall indicated that she was unable to move appellee to another position. Appellee continued to work at the winding position although it hurt her hands to do so. Due to difficulty in performing her work tasks, appellee was averaging only 100% of production,

---

[1] This is the second time these parties have been before this court in matters involving the same suit. Appellee previously appealed the trial court's grant of summary judgment in appellant's favor on the basis that she had not exhausted the arbitration/grievance procedure set forth in the collective bargaining agreement between the employer and the employees' labor union. In an unpublished case, we reversed and remanded, finding that the trial court erred in finding that the collective bargaining agreement unambiguously required appellee to exhaust her grievance remedy before pursuing a tort claim for wrongful discharge. *See Gilbert v. General Elec. Co.*, No. CA 98-1461, 1999 WL 714654 (Ark. App. Sept. 8, 1999).

while the rest of her co-workers averaged 129% of production. Richard Krafft, appellee's supervisor, verbally informed her on two occasions that she needed to increase her production. On April 12, 1993, he sent her a letter indicating:

> Your output to date has been acceptable on your current job. You have not yet reached the group average after being on your job for several weeks. At the present time, I am not placing you on lack of suitable work status. You have the opportunity to improve your production to an acceptable level. Starting immediately, your bottom level will be 100% of the group average. I want to see a 5% increase with each passing week.
>
> I will review your records weekly and follow your progress. If you fail to reach the acceptable levels stated, I will be forced to look into lack of suitable work status for you.

Appellee thought that the letter meant that she would be fired. She took the letter to Tom Scott, her union representative, who informed Krafft that appellee was not required to average above 100%. She thereafter received no further reprimands with regard to her production.

Appellee continued to experience pain, tingling, and swelling with her hands. On June 1, she saw Dr. Mahon, another orthopedist who had previously treated her. He did not release her from work, so she returned to work. She testified that on June 9, she went to Mary Ann Cornish, the company nurse, and showed Cornish that her hands were swollen and told her that she needed to see a doctor.

According to appellee, Cornish told her to wait until Cornish made an appointment through Carol Kriss, appellant's workers' compensation representative. Appellee said she went home and called in the next five days and reported to Cornish, who was having problems scheduling the appointment. Appellee also unsuccessfully attempted to contact Kriss. On or around June 16, Cornish left a message on appellee's answering machine stating that she had an appointment set up for June 23. When appellee returned Cornish's call, Cornish told her to call in every night to inform the guard that she was not going to be at work.

Appellee stated that one night when she called and informed the guard of her absence, Krafft spoke with her on the phone. He asked how she was doing, and she told him that her hands were

getting worse. He also asked if she would be able to come back to work soon, and she told him that she did not know. Appellee informed him that Cornish scheduled a doctor's appointment for her on June 23. She said Krafft told her to stay home and take care of herself and keep them informed.

On June 16, Cornish received an e-mail from Krafft. His message stated:

> I believe Lila Gilbert has been out for the last five working days. I've tried to call her, but her number listed in the company records has been disconnected. She calls in each night saying she will not be in, but doesn't leave a message. Could you please find out how she is doing or if you know, let me know her status? I've instructed the guard to get me a telephone number where she can be reached.

Cornish responded to Krafft the same day via e-mail:

> What can I tell you about Lila Gilbert? Lila's chief complaint at this time is "hand pain." Her medical evaluation in May stated that she should continue her "light duty work." She requested a change of physicians and had recently been evaluated by a local orthopedist. I have not seen the written report, but a verbal report from our claims administrator indicates that she has been released for work. Lila has requested another appointment with this orthopedist and I will be calling this office today. It appears Lila's absences are self-imposed. We are working very hard to close this case.

Appellee saw Dr. Mahon again on June 23, 1993. On June 28, 1993, Dr. Mahon sent the following letter to the company that processed workers' compensation claims for appellee:

> Upon the request of Ms. Cornish, the General Electric Nurse, I did again see Ms. Gilbert in the office June 23rd. Examination findings remain unchanged from those previously reported to you. *I again advised Ms. Gilbert if she continues to do repetitive activities, probability of recurrence or more difficulty is much greater. We discussed the possibility of her changing jobs.* She also wished to have medical release from work, but I advised her this was not possible, as I felt she could continue working.

(Emphasis added.)

On June 24, appellee called to speak with Nall. The purpose of this call is disputed. Appellee maintains she called to report back to

work, but appellant notes that in her deposition she stated when she called to inform them that she was off for a week *with her cyst*, she was fired. However, it is undisputed that appellee was fired when she called on June 24. Nall informed her that she no longer had a job there because she had not called in and had not informed them regarding the reasons for her absences. Nall also told her she was being terminated because she was absent for two weeks without a doctor's note.

After appellee was terminated, she sought assistance from Scott. He spoke with Nall and told appellee that if she could get a doctor's note for the two weeks that she was absent, she could return to work. Appellee never submitted a doctor's note to appellant. Nor did she file a grievance with the union. She settled her workers' compensation claim with appellant in 1995 and filed a wrongful discharge suit against appellant in May 1996. The case proceeded to trial on November 2, 2000.

◼ In *Wal-Mart, Inc. v. Baysinger*, 306 Ark. 239, 812 S.W.2d 463 (1991), the Arkansas Supreme Court recognized that as a matter of public policy, the common-law doctrine of employment-at-will does not bar a suit for wrongful discharge where the former employee alleges that she has been discharged in retaliation for filing a workers' compensation claim. In 1993, the General Assembly amended the workers' compensation statutes to eliminate the *Baysinger* cause of action. *See* Ark. Code Ann. § 11-9-107(d), (e) (Repl. 1996). This statute was effective as of July 1, 1993; however, because appellant was discharged prior to July 1, 1993, her *Baysinger* cause of action was not abrogated by the General Assembly.

◼◼ The burden of proof to establish a *prima facie* case of wrongful discharge is upon the employee. *See Wal-Mart, Inc. v. Baysinger*, 306 Ark. 239, 812 S.W.2d 463 (1991). A *prima facie* case is made by presenting substantial evidence that the workers' compensation claim was a cause of the discharge. When an employee has made a *prima facie* case of retaliation, or wrongful discharge, the burden shifts to the employer to prove that there was a legitimate, non-retaliatory reason for the discharge. *See id.*

◼◼ In ruling on a motion for a directed verdict, the trial court must view the evidence that is most favorable to the nonmoving party and give it its highest probative value, taking into account all reasonable inferences deducible from it. *See Burns v. Boot Scooters, Inc.*, 61 Ark. App. 124, 965 S.W.2d 798 (1998). If the evidence is so insubstantial as to require that a jury verdict for the nonmoving

party be set aside, then the motion should be granted. If, however, there is substantial evidence to support a jury verdict for the non-moving party, then it should be denied. *See id.* Substantial evidence is that which is of sufficient force and character that it will compel a conclusion one way or another. It must force or induce the mind to pass beyond a suspicion or conjecture. *See id.*

■ We hold that the trial court did not err in denying appellant's motion for a directed verdict. Appellee was not required to present *prima facie* evidence that her workers' compensation claim was the *sole* factor in her termination, only *one* factor. *See Wal-Mart v. Baysinger, supra.* Moreover, to withstand a motion for a directed verdict appellee was only required to raise a reasonable inference that her workers' compensation claim was a factor in her termination.[2]

Here, appellee presented evidence that she had filed a workers' compensation claim for which she was still receiving treatment, that

---

[2] The dissent argues that we drew unreasonable inferences in concluding that appellee proved a *prima facie* case of wrongful discharge. This argument merely reinforces our holding that the trial court properly concluded that the case should not have been dismissed on a motion for a directed verdict. Whether the evidence reasonably supports an inference is a question of fact for a jury to determine. If reasonable minds can differ about the conclusions to be drawn from a set of facts, as the dissenting opinion vividly demonstrates, then the issue is properly decided by a jury, not on a motion for a directed verdict. *See Morehart v. Dillard Dep't Stores,* 322 Ark. 290, 908 S.W.2d 331 (1995). The question we determine on appeal is not whether we agree with the inferences drawn by the jury, but whether the *facts support* the inferences drawn by the jury. *See Burns v. Boot Scooters, Inc., supra.*

Further, although the dissenting opinion recognizes that the a *prima facie* case of wrongful discharge will ordinarily be proved by circumstantial evidence, it ignores the circumstantial evidence in this case by finding no evidence in the record: (1) that appellant disregarded medical orders or forced appellee to continue to work in a job that violated her medical restrictions; (2) to support appellee's "opinion" that she was terminated because she filed a workers' compensation claim; (3) that management displayed an antagonistic attitude toward her injuries; or (4) that appellant demonstrated a pattern of terminating employees who filed such claims.

Our opinion clearly sets forth the evidence that appellant disregarded medical orders, forced appellee to continue to work in a job that violated her medical restrictions, and displayed an antagonistic attitude toward her injuries. Further, our opinion clearly declares the evidence supporting an inference that appellee was fired because she filed a workers' compensation claim. We did not base our holding on appellee's "opinion" about why she was fired. Finally, while evidence of a pattern of termination against workers' compensation claimants is certainly proof of an employer's animus, the dissenting opinion cites no authority requiring a claimant to prove that such a pattern exists in order to meet her *prima facie* case. The *real* inquiry is whether there was any evidence creating an inference of retaliation, not whether the employer displayed a pattern of animus toward injured workers seeking compensation benefits.

management had displayed an antagonistic attitude toward her injuries, and that she was fired while she was absent for work due to the injuries that led to her workers' compensation claim. Appellee filed a workers' compensation claim based upon carpal-tunnel syndrome and her claim was continuing. As early as August 1992, Dr. McDaniel advised appellee to avoid repetitive work and none of appellant's doctors appeared to have removed this restriction, which is consistent with an ongoing diagnosis of carpal-tunnel syndrome.

Moreover, appellee testified that Dr. Mahon advised her on June 23 against activities involving repetitive motion and advised her to change jobs. Her testimony is corroborated by Dr. Mahon's notes from June 23, which indicate that he *again* advised appellee that if she continued to perform repetitive activities, "the probability of recurrence or more difficulty is much greater" and that they "discussed the possibility of her changing jobs." If he *again* advised her on June 23, then he must have so advised her on at least one prior occasion. Despite these medical orders, however, appellant forced appellee to continue to work at a position that violated her medical restrictions.

■ Further, there was substantial evidence that management displayed an antagonistic attitude toward appellee. Her supervisor reprimanded her three times with regard to her production level and threatened to place her on lack of suitable work status, which could eventually lead to termination, even though under the union's rules this threat was unjustified because she was averaging 100% of production. In addition, the correspondence between Krafft and Cornish shows that management knew that she was having problems with her hands, knew that she was calling in as instructed to report her absences, knew that she was absent from work and why, and knew that she was waiting on Cornish to schedule a doctor's appointment. Additionally, Cornish's e-mail reflects a less-than-tolerant attitude towards appellee and shows that Cornish felt the need to assure Krafft that appellee's compensation claim would be resolved soon. Finally, Nall testified that employees who are absent for five days without a doctor's note receive disciplinary action short of termination. However, appellee never received *any* disciplinary action short of termination related to these absences. On these facts, the evidence was sufficient to support the jury's finding that appellee's workers' compensation claim was a factor in her termination.

■ We also hold that the trial court did not err in denying appellant's motion for a directed verdict because appellant did not

present substantial evidence showing that it had a legitimate, non-discriminatory basis for discharging appellee. Appellant maintains that appellee was terminated for violating a provision in the "National Agreement" or collective bargaining agreement provision, concerning continuity of service. This section of the agreement states in pertinent part:

> Loss of Service Credits and Continuity of Service.
>
> Service credits previously accumulated and continuity of service, if any, will be lost whenever the employee:
>
> Quits, dies, resigns, retires or is discharged.
>
> Is absent from work for more than two consecutive weeks without satisfactory explanation.
>
> Is absent from work because of personal illness or accident and fails to keep the Company notified monthly, stating the probable date of his return to work.

Appellant maintains that appellee was discharged because she violated this provision by missing work for ten consecutive days without obtaining a medical excuse for doing so. The short answer to appellant's argument is that this provision does not provide any ground for terminating employees. Rather, this provision provides the basis for withholding or granting *service credits*, which are used to determine an employee's seniority status with regard to lay-offs, job transfers, reductions in force, work recalls, and accrual of vacation and personal days. Nothing in this provision provides that the employer may *terminate employment* for missing two consecutive weeks without a doctor's note, and appellant presented no evidence of any other personnel policy stating that an absence based on medical reasons requires a doctor's excuse.

Even if the loss-of-service provision provided appellant with a basis for termination, this provision does not specifically require a medical excuse; it only requires a satisfactory explanation. Further, if a satisfactory explanation was required, a jury could have found that one was given, because the evidence shows that management was aware of appellee's absences and why she was absent.

Cornish maintained that she was unaware that appellee was not working until she received the e-mail from Krafft. However, this

assertion is contradicted by Cornish's testimony that she told appellee that she was expected to call in. Cornish knew that appellee continued to have problems with her hands, was absent because she was experiencing problems with her hands, and was awaiting a doctor's appointment. She instructed appellee to call in, as did Krafft. Further, the e-mail from Krafft shows that he also knew appellant was absent and was calling in.

██ Appellant argues that appellee cannot have a satisfactory explanation absent a medical excuse where she was absent for medical reasons. However, the evidence in this case shows that appellant had no policy requiring a doctor's note for absences in excess of five days and that management was fully apprised of appellee's absences. We hold that this was substantial evidence to support the jury's verdict.

While we affirm the denial of appellant's motion for a directed verdict, we reverse with respect to the award of pension benefits. Although appellee proved her *prima facie* entitlement to pension benefits, she failed to specifically prove the amount of pension benefits to which she was entitled.

██ ██ The proper measure of damages in a public-policy wrongful-discharge action is the sum of lost wages from termination until day of trial, less sum of any wages that an employee actually earned or could have earned with reasonable diligence; additionally, an employee may recover for any other tangible benefit lost as a result of the termination. *See Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988). The party asserting entitlement to damages has the burden to prove the claim. *See Milligan v. General Oil Co.*, 293 Ark. 401, 738 S.W.2d 404 (1987). Damages must not be left to speculation and conjecture. *See Pennington v. Harvest Foods, Inc.*, 326 Ark. 704, 934 S.W.2d 485 (1996).

Appellant concedes that if appellee was entitled to damages, she would be entitled to damages for lost pension benefits from her last day of work to the date of the trial, but maintains that nothing in the evidence submitted by appellee provides a means by which to establish a judgment amount. We agree.

The jury entered an award for "damages of $79.535.44 plus 10% interest plus pension." Appellee submitted into evidence a check stub dated May 23, 1993, showing her pension gross as of that date of $5,615.58. She testified that she began working for appellee in 1973 and had worked there for twenty years. However,

appellee also testified that there were numerous times when she was laid off during that twenty-year period. Although there was no testimony presented as to the means by which appellant calculated appellee's pension benefits, or whether her pension benefits continued to accumulate during those periods of layoff, the trial judge apparently divided the pension gross by the number of years appellee had worked for appellant, resulting in a pro rata figure of $280 per year in pension benefits received. The trial judge then apparently multiplied that figure by the approximate term of the seven-plus years between appellee's termination and her trial, to reach the figure awarded, $1,965.45.

We hold that the evidence was insufficient to specifically prove the amount of appellant's lost pension benefits. We recognize that the trial judge attempted to fashion a remedy based on sparse evidence in the record that was related to lost pension benefits. However, in the absence of evidence showing how appellee's benefits accumulated and whether her pension benefits continued to accumulate during periods of layoff, the trial judge had to assume that appellee continually and uniformly accumulated pension benefits during her twenty-year period of employment. This assumption is not supported by the evidence. Further, we do not believe that remand for reconsideration to the trial judge would be constructive because there is nothing in the record that he has not already considered that would enable him to properly render an award for lost pension benefits.

Therefore, we affirm with respect to the denial of appellant's motion for a directed verdict, but reverse with respect to the award of lost pension benefits.

Affirmed in part; reversed in part.

ROBBINS, NEAL, VAUGHT, and BAKER, JJ., agree.

PITTMAN, J., concurs.

BIRD, CRABTREE, and ROAF, JJ., dissent.

SAM BIRD, Judge, dissenting. I agree with the majority opinion in its reversal of the trial court for its award of damages to Gilbert for lost pension benefits. However, in my view the case should be reversed in its entirety and dismissed because of Gilbert's failure to present substantial evidence that constitutes a *prima facie*

case that she was discharged from her employment in retaliation for her filing of a workers' compensation claim.

This court will affirm a denial of a motion for directed verdict if the verdict is supported by substantial evidence. *Pettus v. McDonald*, 343 Ark. 507, 36 S.W.3d 745 (2001). We review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *D.B. Griffin Warehouse, Inc. v. Sanders*, 336 Ark. 456, 986 S.W.2d 836 (1999). We have long held that substantial evidence is not present where a factfinder is merely given a choice of possibilities which require the jury to conjecture or guess as to a cause. *Morehart v. Dillard Dept. Stores*, 322 Ark. 290, 908 S.W.2d 331 (1995).

The burden of proving a *prima facie* case of wrongful discharge is on the employee. *Wal-Mart, Inc. v. Baysinger*, 306 Ark. 239, 812 S.W.2d 463 (1991). As the majority observes, in meeting that burden, Gilbert was not required to prove that her workers' compensation claim was the sole reason for her termination, but only one factor. *Id.* However, an employee does not meet her burden by merely pointing to the fact that she has been discharged. *Clair v. District of Columbia Dep't of Empl. Servs.*, 658 A.2d 1040 (D.C. 1995). To prove the necessary retaliatory animus, the employee must make some additional showing beyond the discharge. *Id.*; *see also Flentje v. First Nat'l Bank of Wynne*, 340 Ark. 563, 574, 11 S.W.3d 531, 539 (2000) (explaining that Flentje's own perception of her supervisor's actions, without a supporting affidavit or other form of proof, was insufficient to support a reasonable inference of discriminatory intent). For example, an employee can meet her burden by showing that the employer has engaged in a similar pattern against other employees, or by evidence that a supervisor uttered words such as, "I'll teach you to file a workers' compensation claim." 6 Arthur Larson, *Larson's Workers' Compensation Law*, § 68.36(c) (2000). No evidence of this nature was offered by Gilbert.

Ordinarily the *prima facie* case must, in the nature of things, be shown by circumstantial evidence, since the employer is not apt to announce retaliation as its motive. *See id.* § 104.07[3]; *Mapco v. Payne*, 306 Ark. 198, 812 S.W.2d 483 (1991). Professor Larson sets out the typical beginning point for presenting a *prima facie* case as proximity in time between the claim and the firing, coupled with evidence of satisfactory work performance and supervisory evaluations. *Id.* No close temporal proximity existed between Gilbert's claim and the date of her termination. Gilbert filed her workers'

compensation claim in October of 1992 and she was fired on June 24, 1993, a time span of nine months. The remaining circumstantial evidence in this case fails to establish a fact issue for the jury, even when all reasonable inferences are drawn, that Gilbert was terminated in retaliation for filing a workers' compensation claim.

In my opinion, there is no evidence in the record, substantial or otherwise, to support a finding that Gilbert was terminated in retaliation for filing a workers' compensation claim. While this court, when asked to review a denial of a motion for directed verdict, views not only the evidence, but also all reasonable inferences deducible from the evidence, in a light most favorable to the appellee, *see ERC Mortgage Group, Inc. v. Luper*, 32 Ark. App. 19, 795 S.W.2d 362 (1990), I do not believe that any inferences can be drawn from the evidence presented by Gilbert that support a *prima facie* case. In a lengthy footnote, the majority opinion suggests that the mere fact that the dissenting judges disagree about the reasonableness of inferences that can be drawn from the evidence supports the trial court's decision to deny Gilbert's motion for directed verdict. In making this suggestion, the majority misses the point of the dissenting opinion. The point of this dissenting opinion is that there was not any evidence presented by Gilbert that was legally sufficient to warrant a verdict in her favor.

In the same footnote, the majority states that whether the evidence reasonably supports an inference is a question of fact for a jury to determine. However, in a dissenting opinion in *Burns v. Boot Scooters, Inc.*, 61 Ark. App. 124, 130, 965 S.W.2d 798, 801 (1998) (emphasis added), the author of the majority opinion in the case at bar recognized that:

> It is well settled that where there is any evidence tending to establish an issue in favor of the party against whom the verdict is directed, it is error to take the case from the jury. *Hardeman, Inc. v. Hass, Co.*, 246 Ark. 559, 439 S.W.2d 281 (1969). "Any evidence" means evidence legally sufficient to warrant a verdict. To be legally sufficient, the evidence must be substantial, and *substantiality is a question of law for the trial court to decide. Id.*

Thus, whether the evidence reasonably supports an inference is a question of fact for a jury to determine only so long as the trial court, upon a motion for directed verdict, has determined, as a matter of law, that substantial evidence is present on which the jury *could* base a verdict for the non-moving party. The question of whether evidence was present on which the jury *should* have based a

verdict for the non-moving party is not the issue on appeal and it is not the issue upon which the majority and I disagree.

Following her return to work in January 1993, Gilbert was periodically examined by doctors at Campbell's Clinic, where her surgery had been performed. On March 26, 1993, she was examined by Dr. Jobe, whose records reflect that on that date Gilbert was "doing much better." On May 12, she was examined by Dr. Wood, whose clinic notes state that Gilbert told him that the job she was doing at General Electric involved the minimum amount of repetitive motion possible. After a physical examination, Dr. Wood noted that Gilbert "should continue her light work as noted." On June 1, Gilbert was again examined by Dr. Mahon, who concluded that Gilbert had reached maximum healing from her left carpal tunnel release surgery and assigned a five-percent permanent physical impairment rating to her left arm below the elbow. He assigned no permanent impairment rating to her right arm. As already mentioned, following Dr. Mahon's examination of Gilbert on June 23, he also concluded that she could continue working.

It is noteworthy that from the time Gilbert was released for return to work on January 18, 1993, through June 23, 1993, none of her doctors considered it necessary that she be relieved from work. Despite her lack of a medical work release, Gilbert chose not to work during the two-week period between June 9 and June 23, 1993, without obtaining permission for such absenteeism from her supervisor or any other member of management.

No evidence in the record supports the majority's assertion that General Electric disregarded medical orders or "forced" Gilbert to continue to work in a job that violated her medical restrictions. Rather, the evidence is clear that because Gilbert was restricted to a ten-pound lifting limit upon her return to work, General Electric assigned her to different duties that were less repetitive and met the weight restriction. Gilbert testified that in spite of the new job assignment, her condition continued to worsen. Therefore, on June 9, 1993, she went to the company nurse, showed the nurse her swollen hands, and requested to again be sent to a doctor. The nurse scheduled the appointment and on June 23, Gilbert was seen by Dr. Mahon, an orthopedic surgeon. Dr. Mahon refused to give her a medical release from work because he "felt that she could continue working."

An examination of the abstract of Gilbert's testimony reveals that although she "understood" that she "was to stay home and take care of [her]self" while awaiting an appointment with Dr. Mahon, she did not testify that the nurse or any other General Electric employee authorized or instructed her not to report for work. Gilbert's "understanding" that she was to stay at home does not allow for a *reasonable* inference that she was to miss two weeks of work without informing her supervisor or other management of her reasons for failure to work.

Gilbert testified that when she talked to Richard Krafft, her supervisor, he asked how she was doing and whether she was going to be able to return to work anytime soon. Gilbert testified that when she told Krafft that she did not know when she could return, he told her "to stay home and take care of myself and keep them informed." However, it is clear from the record that this conversation did not take place until after Gilbert had already been absent from work for at least a week, because on June 16, Krafft e-mailed the company nurse inquiring about Gilbert's status and informing her that Gilbert had been absent the last five working days and that he had been unsuccessful in attempts to contact her. Even if Krafft said what Gilbert attributed to him, that statement cannot be inferred as a grant of approval for her absence when she had already missed a week of work without either requesting or receiving his permission to stay home.

Not surprisingly, when Gilbert called General Electric on June 24, she was told that she had been terminated as a result of her failure to report to work for two weeks without a doctor's work release. Gilbert testified that when she complained to her union representative, Tom Scott, about her termination, Scott called back and told her that General Electric had agreed to reinstate her if she could obtain a medical work release for the two weeks.

The only evidence that even remotely suggests that Gilbert was terminated because she had filed a workers' compensation claim is Gilbert's own speculation that, in her "opinion," she was fired because she had filed a workers' compensation claim and her left hand was getting worse. There is absolutely no factual evidence in the record that supports Gilbert's opinion. Furthermore, the medical reports available to General Electric showed only that Gilbert's left hand "continued to improve," that she had reached maximum healing, and that she was released to return to work.

Additionally, there is no evidence to support the majority opinion's assertion that "management had displayed an antagonistic attitude toward her injuries." In fact, the evidence is entirely to the contrary. From the date of diagnosis of Gilbert's carpel tunnel condition until her termination, General Electric provided full workers' compensation benefits. After Gilbert returned to work in January 1993, her work restrictions were accommodated by moving her to a job that involved less repetitive motion and lifting. By Gilbert's own admission, her substitute job involved the least repetitive motion of any job available at General Electric. Even after she was released from treatment on June 1, 1993, another doctor's appointment was scheduled when Gilbert continued to complain of pain. This is not evidence of antagonism to Gilbert's claim; quite to the contrary, it is evidence that General Electric was trying to do everything it could to return Gilbert to work as a fully-productive employee.

Nor was there any evidence of a pattern on the part of General Electric in terminating employees who filed workers' compensation claims. In fact, the evidence established that for a period of five years surrounding her discharge, Gilbert was the only one out of 109 workers' compensation claimants at General Electric to be involuntarily discharged.

In *Wal-Mart, Inc. v. Baysinger, supra,* Baysinger was discharged from her employment for the stated reason that her doctor reported Baysinger's medical condition to be such that "continued exposure to this type work could lead to more serious injury." The difficulty with Wal-Mart's reason for Baysinger's discharge was that the doctor had not made such a report, and the doctor testified that he could not recall saying such a thing. In the case at bar, there is no such inconsistency between the medical reports and General Electric's reason for discharging Gilbert. All of the doctors who examined Gilbert after her return to work on January 18 said that she could continue to work, and they declined to release her. All of the actions taken by General Electric were directed at getting Gilbert back to work. The only conduct that was inconsistent with the doctors' reports was Gilbert's decision that she needed to stay home, despite the unanimous opinions of her three doctors that she was able to work within the ten-pound lifting restriction.

Gilbert has not met her burden of proving that her workers' compensation claim was a factor in her termination. The only conclusions supported by the evidence presented by Gilbert, and reasonable inferences therefrom, are that she sustained an injury on

her job; that the injury was readily accepted as compensable; that General Electric provided Gilbert with all the benefits to which she was entitled under the Workers' Compensation Act; that General Electric made every effort to accommodate Gilbert's condition upon her return to work, but that, notwithstanding her doctor's refusal to release her from work, she did not come to work for two weeks; that despite such absenteeism, General Electric offered to reinstate Gilbert's employment if she could provide a medical release for the time during which she was absent from work; and that there is no pattern of retaliatory discharge at General Electric. General Electric terminated Gilbert nine months after the filing of the claim, during which time it offered working conditions within her restrictions. This time delay cannot be said to constitute close proximity in time between the filing of the workers' compensation claim and termination of employment. Gilbert's evidence merely consisted of two elements; that she had filed a workers' compensation claim and that she was later discharged. This alone cannot constitute a *prima facie* showing of wrongful discharge, see *Clair v. District of Columbia Dep't of Empl. Servs., supra*, and is not substantial evidence on which a jury could base a verdict for Gilbert.

To find a *prima facie* case of wrongful discharge in this case, one would have to engage in impermissible speculation and conjecture. The jury was given a choice of possibilities that required them to conjecture or guess as to the cause of Gilbert's termination. Accordingly, the trial judge's failure to grant General Electric's motion for directed verdict was clearly erroneous, and the jury verdict should be reversed and the case dismissed.

CRABTREE and ROAF, JJ., join in this dissent.