CHEVRON U.S.A, INC. *v.* MURPHY EXPLORATION & PRODUCTION COMPANY, Merit Energy Partners III, L.P., Merit Partners, L.P., and Merit Energy Company

03-612                                                          151 S.W.3d 306

Supreme Court of Arkansas
Opinion delivered March 4, 2004

Perkins & Trotter, PLLC, by: G. Alan Perkins and Julie DeWoody Greathouse, for appellant.

Rose Law Firm, by: Richard T. Donovan, for appellee Murphy Exploration & Production Co.

Shackleford, Phillips, Wineland & Ratcliff, P.A., by: Dennis L. Shackleford; and Carver & Kirchhoff, LLC, by: Craig R. Carver, for appellee Merit Energy Partners III, L.P., Merit Partners, L.P., and Merit Energy Company.

TOM GLAZE, Justice. This appeal arises out of a declaratory judgment action filed by Murphy Exploration & Production Company ("Murphy") against Chevron U.S.A. Inc. ("Chevron") in Union County. Between 1969 and 1987, Chevron and its predecessor in interest, Gulf Oil Corporation, operated an oil and gas lease on a 40-acre tract of land located in Union County. On August 28, 1987, Chevron sold and assigned its lease interest in the 40-acre tract to Murphy, pursuant to a Purchase and Sale Agreement and Assignment and Bill of Sale. Murphy operated the oil and gas lease until June 19, 1996, when it sold its lease interest in the 40-acre tract to Merit Energy Partners III, L.P. and Merit Partners, L.P. ("Merit"). Both sales contracts included indemnification clauses, which are the focus of this appeal.

On July 13, 2001, the owners of the 40-acre tract, James Graves and others ("the Graves plaintiffs") filed suit in federal district court against Phillips Petroleum Company, Texaco Inc., BHP Petroleum (Americas), Inc., Chevron, and Merit. The Graves complaint asserted claims for pollution and contamination of their property and the surrounding environment allegedly caused by the defendants' improper handling, transportation, storage and disposal of hazardous, toxic, and harmful substances in the form of oil and gas exploration and production wastes. Chevron responded by asserting its right of indemnity against Murphy, which in turn notified Merit that Murphy would be seeking indemnification against Merit.

On November 29, 2001, Murphy filed a complaint in Union County Circuit Court, seeking a declaratory judgment against both Chevron and Merit. In this state lawsuit, Murphy asked the Circuit Court to declare that Murphy had no obligation to indemnify Chevron under their Purchase and Sale Agreement because Murphy did not expressly state in clear and unequivocal terms that Murphy was to indemnify Chevron for liability that Murphy may have caused to the 40-acre tract. Alternatively, Murphy asserted that, if it was determined that Murphy had an obligation to indemnify Chevron, Murphy sought a declaration under the Murphy-Merit sale agreement that Merit had an obligation to indemnify Murphy.

Subsequently, Chevron answered Murphy's complaint and filed a counterclaim in which it alleged that the indemnity provisions by which Murphy agreed to indemnify Chevron were sufficiently clear and unequivocal so as to provide indemnity to Chevron for the claims asserted in the Graves federal court action. Merit also answered Murphy's complaint, denying that Merit was obliged to indemnify Murphy. Both Chevron and Murphy then filed motions for summary judgment; Murphy's cross-motion for summary judgment against Chevron included a motion for summary judgment against Merit. Chevron also filed a cross-claim for declaratory judgment against Merit, alleging that the Merit-Murphy indemnity provision provided third-party beneficiary indemnity for Chevron in Chevron's capacity as a predecessor in title to Murphy.

On February 20, 2003, the trial court entered an order granting Murphy's and Merit's motions for summary judgment against Chevron, denied Chevron's motions for summary judgment against Murphy and Merit, denied Murphy's motion against Merit, and granted Merit's motion against Murphy. From this order, Chevron appeals, contending that the trial court erred in concluding (1) that Chevron was not entitled to indemnity from Murphy, and (2) that Chevron was not entitled to indemnity as a third-party beneficiary of the Murphy-Merit agreement.

In its first point on appeal, Chevron argues that the trial court erred in granting Murphy's motion for summary judgment against Chevron and in denying Chevron's own motion. Chevron submits that it is entitled to indemnity from Murphy based on the plain and unambiguous language of the parties' contract. The indemnity clauses between Chevron and Murphy are found in

both the Purchase and Sale Agreement and the Assignment and Bill of Sale; the relevant language from the Purchase and Sale Agreement reads as follows:

> Buyer [*Murphy*] *agrees to* protect, *indemnify* and hold *Seller* [*Chevron*] harmless *against any and all claims, demands and causes of action asserted or filed after closing of this purchase and sale in any way arising from operation of the Assets* and the contracts and agreements appertaining thereto based upon any theory of negligence, willful misconduct, liability without fault or other. [Emphasis added.]

Likewise, the language in the Chevron–Murphy Assignment and Bill of Sale provided the following:

> Assignee [*Murphy*] *agrees to* protect, *indemnify* and hold *Assignor* [*Chevron*] harmless from and *against any and all liability*, loss, damage, injury and claims, demands and causes of action therefore asserted or filed after the effective date hereof *in any way arising from operations or activities related to the Assigned Premises*, Wells and Personal Property and the contracts and agreements appertaining thereto *based upon any theory of negligence, willful misconduct, strict liability, liability without fault or other grounds*. [Emphasis added.]

In granting Murphy's motion for summary judgment, the trial court determined that the foregoing language did not clearly and unambiguously state that Murphy would indemnify Chevron for liability arising from Chevron's own acts and omissions. Citing *Nabholz Construction Corp. v. Graham*, 319 Ark. 396, 892 S.W.2d 456 (1995), the trial court found that the contract was lacking the specificity required for the assumption of liability for another party's negligence. The lower court further stated that, given the language of the indemnification clauses, it could not be said that no other meaning could be ascribed to the wording. On appeal, Chevron argues that the trial court erred by creating ambiguity where there was none. Further, Chevron alleges that, in reaching its results, the trial court misinterpreted the holding in *Nabholz*.

■ When reviewing and construing indemnification agreements, we keep in mind that they are contracts, *see Ray & Sons Masonry v. United States Fidelity & Guar. Co.*, 353 Ark. 201, 105 S.W.3d 818 (2003), to be construed in accordance with the general rules of construction of contracts. *Nabholz, supra; Ark. Kraft Corp. v. Boyed Sanders Constr. Co.*, 298 Ark. 36, 764 S.W.2d 452 (1989); *Pickens-Bond Constr. Co. v. North Little Rock Elec. Co.*, 249 Ark. 389,

459 S.W.2d 549 (1970). If there is no ambiguity in the language of the indemnification provision, then there is no need to resort to rules of construction. *Arkansas Kraft Corp., supra.*

◼ When considering indemnification agreements entered into by prime or general contractors and subcontractors, this court has held that a subcontractor's intention to obligate itself to indemnify a prime contractor for the prime contractor's own negligence must be expressed in clear and unequivocal terms and to the extent that no other meaning can be ascribed. *Nabholz, supra; see also Hardeman, Inc. v. Hass Co.,* 246 Ark. 559, 439 S.W.2d 281 (1969). While no particular words are required, the liability of an indemnitor for the negligence of an indemnitee is an extraordinary obligation to assume, and we will not impose it unless the purpose to do so is spelled out in unmistakable terms. *Arkansas Kraft Corp., supra* (citing *Batson-Cook Co. v. Industrial Steel Erectors,* 257 F.2d 410 (5th Cir. 1958)). It is also well settled that in contracts of indemnity the losses to be indemnified must be clearly stated and the intent of the indemnitor's obligation to indemnify against them must be expressed in clear and unequivocal terms and to such an extent that no other meaning can be ascribed. *Pickens-Bond, supra; Hardeman, supra; Weaver-Bailey Contractors, Inc. v. Fiske Carter Const.,* 9 Ark. App. 192, 657 S.W.2d 209 (1983). The intent to extend the obligation to losses from specific causes need not be in any particular language, but unless this intention is expressed in the plainest words it will not be deemed that the party undertook to indemnify against it. *Pickens-Bond, supra; see also Arkansas Kraft Corp., supra.* Indemnity agreements are construed strictly against the party seeking indemnification. *See Potlatch Corp. v. Missouri Pac. R. R. Co.,* 321 Ark. 314, 902 S.W.2d 217 (1995); *East-Harding, Inc. v. Horace A. Piazza & Assocs.,* 80 Ark. App. 143, 91 S.W.3d 547 (2003).

◼ As alluded to above, these indemnification cases all arose in the context of construction contracts entered into between general or prime contractors and subcontractors. The present situation, however, involves an oil and gas lease contract, which requires a somewhat different review. For example, in *Bonds v. Sanchez-O'Brien Oil & Gas Co.,* 289 Ark. 582, 715 S.W.2d 444 (1986), this court held that an oil and gas lessee is under an implied duty to restore the surface of the land to the condition

prior to the commencement of the drilling. In reaching this conclusion, the court reasoned as follows:

> We are persuaded that the current trend toward placing the burden of restoration [of the surface of land involved in oil and gas exploration and drilling] on the lessee is the better view. This viewpoint recognizes a legitimate legal concern for the environment. In recognition of this concept, many responsible members of the oil industry have already voluntarily begun to clean up their abandoned sites, and we must base decisions upon current concepts of what is right and just. To hold otherwise would allow the lessee to continue to occupy the surface, without change, after the lease has ended. This would constitute an unreasonable surface use, and no rule is more firmly established in oil and gas law than the rule that the lessee is limited to a use of the surface which is reasonable. Accordingly, we hold that the duty to restore the surface, as nearly as practicable, to the same condition as it was before drilling is implied in the lease agreement.

*Bonds*, 289 Ark. at 585.

■ This implied duty to restore the surface in oil and gas contracts reflects a different focus or concern than is found in this court's other indemnification cases. Generally speaking, the issues in construction contractor-subcontractor cases have centered around whether a subcontractor can be held liable for acts of negligence on the part of the general contractor, when those acts of negligence lead to an instance of personal injury. *See, e.g., Nabholz, supra* (employee of subcontractor injured in accident occasioned by negligence of general contractor); *Arkansas Kraft Corp., supra* (employee of subcontractor injured while working on a construction project). In an oil-and-gas lease case such as the one now before us, however, the concern is with ongoing environmental issues that frequently persist over a span of years and that may or may not be known at the time an oil and gas lease is transferred from one exploration company to another.

Although there are no Arkansas cases on this precise subject, at least one federal appellate court has addressed a similar matter. In *Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321 (7th Cir. 1994), Lefton Iron & Metal purchased a 40-acre industrial site from Moss-American, Inc., the predecessor in interest of Kerr-McGee. The land had been used since 1927 to manufacture wood products in a process that involved treating the wood with

creosote and other preservatives. In 1988, the State of Illinois filed a complaint against Kerr–McGee and Lefton, alleging various pollution claims and seeking to require the parties to clean up the site. Kerr–McGee entered a settlement by which it agreed to undertake any and all remedial work necessary to protect the public health and the environment. Kerr–McGee subsequently brought an action against Lefton, seeking indemnification pursuant to the 1972 contract transferring the land from Moss–American to Lefton. *Kerr-McGee*, 14 F.3d at 324.

Although the federal district court found in Lefton's favor, the Seventh Circuit Court of Appeals reversed on the basis of an indemnification clause found in the contract transferring ownership of the site from Moss–American to Lefton. That clause provided as follows:

> [*Lefton*] *expressly agrees to indemnify* and to defend and hold [*Kerr-McGee's predecessor Moss-American*], its officers, employees, and agents, free and *harmless from and against any and all claims*, damages, judgments, fines, penalties, assessments, losses, expenses, including interest, court costs and attorney fees, *however the same may be caused, arising out of or resulting from, directly or indirectly, the following*: (a) the purchase, dismantling or sale of the personal property and real property by [Lefton]; (b) *the maintenance of any action, claim or order concerning pollution or nuisance; and* (c) *the use by [Lefton] or its employees or agents of the personal property and real property*.

*Id.* at 326–27 (emphasis added).

The federal district court had found that this indemnity provision was "so unclear that the court would not enforce it." The Seventh Circuit Court of Appeals disagreed and held that the district court erred in refusing to enforce the indemnity clause on the grounds that the clause was not intended to cover Kerr–McGee's own fault. Noting that Illinois courts (like Arkansas courts) hold that indemnification contracts will not be construed as indemnifying a party for its own negligence unless such construction is required by clear and explicit language, the Seventh Circuit noted that there had been no finding that Kerr–McGee or its predecessors had acted negligently or wrongfully at the site. The court continued as follows:

> But even if there had been a finding of fault, Lefton would be required to indemnify Kerr–McGee. In unequivocal terms, the

indemnity agreement makes clear that the question of fault is irrelevant: Lefton explicitly agreed to assume the costs of all claims relating to pollution or nuisance "however the same may be caused." Furthermore, Lefton knew of the pollution at the site when it purchased the property: its inspection of the site revealed signs of pollution; soil samples indicated the presence of creosote; and most importantly, in the contract of sale Lefton expressly acknowledged the presence of wood preservative (of which creosote is one) on the property. . . . Lefton might not have foreseen that these chemicals would one day need to be removed at a substantial price. *But when it agreed to take the property "as is" and to "indemnify . . . [and] hold [Kerr-McGee's predecessor] harmless from and against any and all claims . . . however the same may be caused, arising out of or resulting from . . . the maintenance of any action, claim or order concerning pollution or nuisance," it agreed to assume future costs resulting from the presence of chemicals on the property.* That Kerr-McGee's predecessor was the source of the pollution is immaterial; when Lefton bought the property, it bought the chemicals then on the site and the future liabilities that went with them.

*Id.* at 327–28 (emphasis added).

In the present case, as in *Kerr-McGee*, Murphy agreed to purchase the lease from Chevron "as is"; the contract also stated that Murphy explicitly assumed the "risk of description, title, and the condition of the Assets and shall satisfy itself with regard thereto." Thus, Murphy was — or should have been — on notice of any existing or potential environmental problems with the property. Further, the indemnity clause provided that Murphy would indemnify and hold Chevron harmless against any and all claims arising from operation of the Assets based upon any theory of negligence, willful misconduct, liability without fault, or other. Although the *Kerr-McGee* indemnity clause specifically mentioned "any action, claim or order concerning pollution or nuisance," the language in the Chevron–Murphy agreement is even broader, providing that Murphy would indemnify Chevron *"against any and all* claims, demands and causes of action . . . *in any way arising* from operation of the Assets . . . *based upon any theory* of negligence, willful misconduct, liability without fault, or other." (Emphasis added.) Finally, because an oil and gas lessee has an implied duty to restore the surface of the land to its pre-development condition upon cessation of production, *see Bonds v. Sanchez-O'Brien Oil &*

*Gas Co.*, *supra*, then Murphy should be held to have known that it was taking on the duty to restore any existing surface damage to the former Chevron property.

██ Construing the contract as a whole, as we must, *see First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 832 S.W.2d 816 (1992), we conclude that Murphy assumed the risk of the environmental conditions on the property. The Chevron-Murphy indemnity agreements' language, covering "any and all claims arising from the operation of the property," is clearly broad enough to provide indemnification against environmental claims. Therefore, we conclude that the trial court erred in finding that the indemnification clause did not bind Murphy to indemnify Chevron against the claims asserted by the Graves family in their federal court lawsuit.

We turn now to the issue of indemnification as between Murphy and Merit. The trial court concluded that Murphy's motion for summary judgment against Merit, in which Murphy sought indemnification from Merit in the event it was required to indemnify Chevron, was moot. However, because we have found Murphy liable for indemnification to Chevron, we must consider whether Merit, in turn, is obligated to indemnify Murphy. The relevant language of the Murphy-Merit agreement is as follows:

> Purchaser [Merit], its successors and assigns, hereby *agrees to indemnify and defend seller* [Murphy], its successors and assigns, its officers, directors, agents or employees and any and all of seller's subsidiary, affiliate or parent companies and their officers, directors, agents, or employees and *any of seller's predecessors in title from and against all claims, demands, damages, obligations, costs, other liabilities (including attorney's fees), and causes of action, including any civil fines, penalties or cost of cleanup ("environmental claims"), brought by any and all persons,* including (without limitation) purchaser's and seller's employees, agents or representatives and also *including (without limitation) any private citizens,* persons, organizations and any agency, branch or representative of federal, state, or local government *on account of damage, destruction or loss of property, contamination of natural resources (including soil, surface water or ground water) resulting from or arising out of any liability caused by or connected with the joint, concurrent, or sole negligence of seller,* any or all of seller's subsidiary, affiliate or parent companies, *or any of seller's predecessors in title* (whether active or passive), or the presence, disposal or release of any material of any kind in or under the properties at the time it is conveyed to purchase

or thereafter caused by acts of purchaser, its agents, employees, representatives, successors or assigns with regard to its use of the described properties subsequent to the conveyance of the described properties. [Emphasis added.]

This language clearly, unequivocally, and unmistakably obligates Merit to indemnify Murphy for liability arising from Murphy's acts and omissions, or the acts and omissions of any of Murphy's predecessors in title. At the hearing on the motions for summary judgment, counsel for Merit asserted that the purpose of using the "predecessor in title" language was to create a "pass-through indemnification protection" to Murphy in the event that Murphy should be liable for an indemnity owed by it to its predecessors in title. This is precisely what occurred in this case, as discussed, above, and thus, we hold that as Murphy is obligated to indemnify Chevron, Merit is likewise bound to indemnify Murphy and Chevron by the express language of its indemnification agreement found in its purchase and sale agreement with Murphy.

Reversed and remanded.