MARINE SERVICES UNLIMITED, INC. *v.* Dennis
RAKES and Karen Rakes

95-1013 918 S.W.2d 132

Supreme Court of Arkansas
Opinion delivered March 18, 1996

*Everett, Shemin, Mars & Stills*, by: *David D. Stills* and *John C. Everett*, for appellant.

*Stephen Lee Wood, P.A.*, by: *Stephen Lee Wood*, for appellees.

ANDREE LAYTON ROAF, Justice. Marine Services Unlimited, Inc. appeals from the chancery court's award of judgments to Dennis Rakes, a shareholder and former president, for wrongful termination and to Karen Rakes, also a shareholder, for unpaid wages. The corporation also appeals from the chancellor's failure to award judgment for certain personal expenses paid by the Rakes from corporate funds without proper authorization. We affirm the judgment of the chancellor, but modify the award as to Dennis Rakes.

### Facts

Appellant Marine Services Unlimited, Inc., (MSU) is an Arkansas corporation operating a business in Benton County know as Rocky Branch Marina (marina). Wade Young, Randy

Blevins, and appellee Dennis Rakes purchased the business in July 1989. They each paid $50,000 for a one-third interest in the corporation. The corporate minutes of July 12, 1989, reflect a meeting of the Board of Directors in which Dennis Rakes was elected president, Randy Blevins was elected Vice President, and Wade Young was elected Secretary. Karen Rakes was later added to the stock certificate of Dennis Rakes.

Dennis Rakes had a plumbing business at the time, Randy Blevins was retired, and Wade Young was living in Memphis, Tennessee, and working as a pilot for Northwest Airlines. Dennis Rakes was also selected as manager of the business, at a salary of $2500.00 per month; he later closed his plumbing business and worked solely at the marina. Karen Rakes was selected by the shareholders to run the office at the marina. The Rakes managed and operated the marina from June 1989 until October 1992, essentially 365 days per year. During that time, the Rakes were on call 24 hours a day; the telephone lines from the marina were transferred to their residence after hours. Karen Rakes worked without pay for most of the three years.

In 1992, Dennis Rakes injured himself at the marina and aggravated a preexisting medical condition. Mr. Rakes was unable to attend to the business and spent much of the summer bedridden, while Karen Rakes ran the marina.

Sometime during the first week of October 1992, Young and Blevins became concerned about the state of affairs at the marina. Young came to the Rakes' home, noted Dennis Rakes' condition, and obtained five or six grocery sacks full of receipts, checks, cash, and other material relating to the business. Young and Blevins held an emergency meeting of the MSU board of directors on October 12, 1992, with the MSU accountant and attorney present, cited a list of failures on the part of Dennis Rakes, and removed him as President and manager of MSU. They also voted to continue paying Rakes' salary of $2500 net per month; Young and Blevins then assumed control of the business. Neither of the Rakes were given notice of the meeting.

Young and Blevins met again on October 23, 1992, as shareholders, without giving notice to the Rakes. As a "majority" of shareholders, they voted to remove Dennis Rakes as President of MSU and to replace him with Blevins. Dennis Rakes

received notice of and attended a shareholders meeting on January 18, 1993. He acknowledged learning at this meeting that he had been removed as manager and president of MSU. He received his salary from October through December 1992 although he performed no services for MSU during the period.

On May 17, 1993, MSU filed a complaint in the Chancery Court of Benton County against Dennis and Karen Rakes, alleging that Dennis Rakes, in his capacity as manager, acted in a negligent and haphazard manner, that the Rakes had converted corporate property to their personal use, and had failed to account for approximately $60,000 of corporate money. The Rakes denied all allegations in the complaint and filed a counterclaim alleging that Karen Rakes was owed for unpaid wages and that Dennis Rakes was entitled to damages for wrongful discharge. The Rakes also sought compensation for the trade-in value of two personal vehicles used in the purchase of two corporate vehicles and the value of certain personal property not returned to Karen Rakes.

Chancellor Don Huffman found that MSU had failed to meet the burden of proof in its claims against the Rakes, that Dennis Rakes was wrongfully discharged from his position as President and manager of MSU, that Karen Rakes was entitled to judgment for unpaid wages, and that the Rakes were entitled to judgment for conversion of their personal vehicles and personal property. Dennis Rakes was awarded judgment in the amount of $37,852.22, for his salary plus health-insurance premiums from January 1993 to the time of trial in June 1994, less his earnings from other employment during that period. Karen Rakes was awarded judgment for unpaid wages for 1990, 1991, and 1992 totalling $59,993. The Rakes were awarded judgment of $5900 for the value of their vehicles and personal items.

### 1. Wrongful discharge

MSU first argues that the trial court erred in determining that Dennis Rakes was wrongfully discharged from his position as manager and in awarding him damages for his wrongful discharge. The by-laws of MSU required that at least three days written notice of special board meetings be given to each member. This requirement also follows the notice requirement found in Ark. Code Ann. § 4-26-805 (Repl. 1991). Dennis Rakes did

not receive notice of the October 12, 1992 board meeting; neither of the Rakes received notice of the October 23, 1992 shareholders meeting.

In awarding judgment to Dennis Rakes for wrongful termination, the trial court correctly stated that corporate actions taken at shareholders' and board of directors' meetings are illegal and invalid if absent shareholders and directors had no notice of the meetings. However, the trial court further stated that "termination or discharge of employment is illegal or wrongful if it violates some well settled public policy" and that the failure to give notice to Dennis Rakes violated Arkansas statutes and therefore violated public policy in Arkansas. The order also stated that Dennis Rakes was entitled to damages for breach of contract.

■ On appeal, this court reviews chancery cases de novo and will reverse the findings of the chancellor only if those findings are clearly erroneous. *Sunbelt Exploration* v. *Stephens Prod. Co.*, 320 Ark. 298, 896 S.W.2d 867 (1995). It is also well settled that we will affirm the trial court where it reaches the right result, even though it may have announced the wrong reason. *Mountain Home Sch. Dist.* v. *T.M.J. Builders*, 313 Ark. 661, 858 S.W.2d 74 (1993).

■ With regard to Rakes' employment as manager, this court has often cited the general rule that "when the term of employment in a contract is left to the discretion of either party, or left indefinite, or terminable by either party, either party may put an end to the relationship at will and without cause." *City of Green Forest* v. *Morse*, 316 Ark. 540, 873 S.W.2d 154 (1994). "Generally, 'employment is held only by mutual consent, and at common law the right of the employer to terminate the employment is unconditional and absolute.' " *Wal-Mart Stores, Inc.* v. *Baysinger*, 306 Ark. 239, 812 S.W.2d 463 (1991) (quoting *Griffin* v. *Erickson*, 277 Ark. 433, 642 S.W.2d 308 (1982). However, we have acknowledged that an employer should not have an absolute and unfettered right to terminate an employee for an act done for the good of the public. *Sterling Drug, Inc.* v. *Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988).

■ In *Sterling*, we recognized four exceptions to the employment-at-will doctrine, stating:

> Arkansas law would recognize at least four exceptions to the at-will doctrine, excluding implied contracts and estoppel. These are: (1) cases in which the employee is discharged for refusing to violate a criminal statute; (2) cases in which the employee is discharged for exercising a statutory right; (3) cases in which the employee is discharged for complying with a statutory duty; and (4) cases in which employees are discharged in violation of the general public policy of the state.

*Sterling, supra* (quoting *Scholtes* v. *Signal Delivery Serv., Inc.*, 548 F.Supp. 487 (W.D. Ark. 1982)). Accordingly, this court held:

> Therefore, we hold that an at-will employee has a cause of action for wrongful discharge if he or she is fired in violation of a well established public policy of the state. This is a limited exception to the employment-at-will doctrine. It is not meant to protect merely private or proprietary interest.

*Sterling, supra.*

■ We have further stated that public policy has been contravened "when the reason alleged to be the basis for a discharge is so repugnant to the general good as to deserve the label 'against public policy.'" *Smith* v. *American Greetings Corp.*, 304 Ark. 596, 804 S.W.2d 683 (1991).

MSU submits that the charge brought against Mr. Rakes at the special meetings held in October 1992 regarding his failure to properly manage the affairs of the corporation was the "reason" for his termination. By holding a majority of shares in MSU, Young and Blevins certainly had the power to terminate Rakes for the reasons given, or for no cause.

■ However, it is the manner of the termination, and not the reason for it that invalidated the actions taken by MSU at the October meetings. Actions taken at a shareholders' meeting of which absent shareholders had no notice are illegal. *See Red Bud Realty Co.* v. *South*, 96 Ark. 281, 131 S.W. 340 (1910). Further, actions of a majority of the members of a board of directors are invalid if absent directors had no legal notice of the meetings. *See Red Bud Realty Co., supra; Bank of Little Rock* v.

*McCarthy*, 55 Ark. 58, 14 S.W. 759 (1892).

Although Dennis Rakes was illegally terminated at the October, 1992 board and shareholders' meetings, he received notice of a shareholders' meeting in January 1993 and attended this meeting. At trial, Rakes testified that he continued in his position with the corporation until the January 1993 meeting. Blevins testified that Rakes understood that he had been removed as President of MSU and did not voice any objection to his removal at the January 1993 meeting. Rakes also testified to receiving three months salary for October through December 1992, even though he was no longer serving as manager of the marina. Here, Rakes accepted the three months salary payments and did not protest his removal at the January 1993 meeting. His silence or acquiescence in the actions of Blevins and Young amounts to a ratification. *Brady* v. *Bryant*, 319 Ark. 712, 894 S.W.2d 144 (1995); *Sims* v. *First Nat'l Bank, Harrison*, 267 Ark. 253, 590 S.W.2d 270 (1979).

█ The trial court erred in awarding Rakes judgment for his salary to the date of trial. We affirm the judgment for wrongful discharge, but reduce it to the sum of $3,323.04 for his salary and health insurance premium for the month of January 1993.

### 2. Back wages

MSU also contends that the trial court erred in awarding unpaid wages to Karen Rakes because she failed to keep accurate records of the hours she worked, because she is excluded by her management status from coverage under either the Fair Labor Standards Act or the Arkansas Minimum Wage Act, and because the damages awarded were based on speculation and conjecture. This argument fails, for several reasons.

In its ruling on the counterclaim pertaining to Karen Rakes' unpaid wages, the trial court stated:

> Ms. Rakes, was employed at $8.00 per hour but since MSU had a cash flow problem she would not be paid until a later time. Ms. Rakes was never paid and has sued for her wages plus overtime. Ms. Rakes kept no record of her hours worked. Ms. Rakes claims to have worked seven days a week since MSU took over the running of the business plus forty hours per week overtime during

the periods of May 1 through September 30 each year. I find that Ms. Rakes worked all but one week in 1990, 1991, and 1992, and that she worked 40 hours per week every week plus 20 hours per week overtime during the period of May 1, through September 30 each year. I find the total wages owed is $64,164.00. I find Defendant's argument and citations to applicable law to be persuasive.

The trial court did not make a specific finding as to which of the two acts, the Fair Labor Standards Act or the Minimum Wage Act of the State of Arkansas, applied to Karen Rakes' claim or indeed if either applied. MSU does not dispute that Ms. Rakes worked without being paid. They assert only that Karen Rakes did not prove the number of hours she worked.

The burden of proving damages rests on the party claiming them and the proof must consist of facts, not speculation. *Minerva Enter., Inc.* v. *Howlett*, 308 Ark. 291, 824 S.W.2d 377 (1992); *Jonesboro Coca-Cola Bottling Co.* v. *Young*, 198 Ark. 1032, 132 S.W.2d 382 (1939).

In this instance, appellee Karen Rakes testified to working at the marina 365 days a year, more than forty hours a week for over three years, most of that time without pay. After hours, the marina's phones were transferred to her home because the marina received phone calls constantly. Ms. Rakes spent most weekends at the marina on a houseboat because of the hours she worked. Young and Blevins did not take an active role in running the marina until they became concerned about the Rakes' management of the business. Young, who currently manages the marina, has hired a full time "dock master" and an office manager to assist him in operating the business.

MSU claims that Ms. Rakes was part of the management, administration and ownership of the marina, and is consequently exempted from both the federal and state minimum wage laws as an individual employed in a bona fide executive, administrative or professional capacity. As MSU did not raise this argument below, it is procedurally barred. We have repeatedly stated that we will not consider alleged errors that were not brought to the attention of the trial court. *Terry* v. *State*, 309 Ark. 64, 826 S.W.2d 817 (1992). Further, a contention that a business is exempt from the Fair Labor Standards Act coverage

is an affirmative defense that is waived if not pleaded. *Donovan v. Hamm's Drive Inn*, 661 F.2d 316 (5th Cir. 1981).

 MSU also asserts that Ms. Rakes was under a fiduciary duty to accurately account for the number of hours that she allegedly worked at the marina for the past years. However, where employers fail to maintain employment records required by the Fair Labor Standards Act, a lower court can rely upon the employee's own recollections to determine the number of hours worked for purposes of determining entitlement to unpaid compensation. *Mumbower v. H. R. Callicott*, 526 F.2d 1183 (8th Cir. 1975).

 An employee suing an employer under the Fair Labor Standards Act for unpaid minimum wages or unpaid overtime compensation has the burden of proving that the employee performed the work for which the employee was not properly compensated. *Anderson v. MT. Clemens Pottery Co.*, 328 U.S. 680 (1946). However, we have said that the burden should not be made an impossible hurdle for the employee, and due regard must be given to the fact that the employer has the duty under the act to keep proper records of employment. *Id.* Also, where an employee produces sufficient evidence to show the amount of work for which the employee was not properly compensated, as a matter of just and reasonable inference, the employer cannot complain that the damages lacked the exactness of measurement that would be possible had the employer kept the records required by the act. *Id.* Further, the rule that precludes the recovery of uncertain and speculative damages applies only to situations where the fact of damage is itself uncertain. *Id.* Of course, here it was certain that Ms. Rakes worked for MSU without compensation for almost three years. We cannot say that the trial court erred in awarding judgment to Karen Rakes for unpaid wages.

### 3. Conversion of Corporate funds

MSU's final argument is that the trial court erred in not awarding judgment in the amount of the Rakes' day care expenses, Dennis Rakes' personal income taxes, and Dennis Rakes' health insurance premiums paid without proper authorization from corporation funds. We first note that the trial court reduced the judgment for back wages awarded to Karen Rakes

by $4171, the exact amount of child care expenses paid from corporate funds. The order stated that "as a matter of equity, [the judgment] should be reduced by $4,171 for unpaid wages . . . ." It is clear that the day care expenses were deducted from the sum awarded Karen Rakes and we need not further consider the point.

 There is no dispute that corporate funds were used to pay for the $21,000.00 in tax withholdings for Dennis Rakes, and the premiums on Dennis Rakes' insurance. However, MSU alleges that it did not know of these payments, while the Rakes allege that Young and Blevins consented to payment of these expenses. Faced with two versions the trial court makes a credibility decision of which witness to believe. *Riddick* v. *Street*, 313 Ark. 706, 858 S.W.2d 62 (1993). We cannot say that the trial court's determination was clearly erroneous.

 The Rakes contend that no objections were made to any of the expenses until after Rakes was removed as President and manager of MSU. They further contend that the $21,000 "personal income taxes" are actually the employment and withholding taxes on Mr. Rakes' salary while President and manager of MSU. The Rakes assert that the corporation agreed to pay him a gross salary of $3200, while MSU argues that the corporation agreed to pay Rakes a gross salary of $2500 and the $700 per month difference amounted to a conversion of corporate funds. Rakes actually received a gross salary of $3200, with $700 withheld as taxes; the $700 per month is the amount in dispute. The minutes of MSU's October 12, 1992 emergency meeting state that "it is agreed that Dennis should continue to receive his $2500 net salary, as before." We cannot say that the trial court erred in determining the Rakes were not liable to MSU for conversion of the $21,000.00.

 MSU contends that $1998.72 paid for the premiums on Mr. Rakes' health insurance policy also amounted to a conversion of corporate assets. Once again, MSU argues that it did not know of this expenditure, while Rakes argues that MSU was fully aware of the payments. The trial court determined that MSU did not produce sufficient evidence to warrant an award

for conversion. Again we cannot say that the trial court was clearly erroneous in making this finding.

Affirmed as modified.