CITY of HUNTINGTON, and Craig Cotner, Individually and in His Official Capacity as Mayor of the City of Huntington *v.* Robert T. MIKLES

CA 06-66                                    240 S.W.3d 138

Court of Appeals of Arkansas
Opinion delivered September 27, 2006

[Rehearing denied October 25, 2006.]

*James O. Cox*, for appellant.

*Kevin Hickey*, for appellee.

JOHN B. ROBBINS, Judge. Appellant City of Huntington ("the city") appeals a jury verdict entered against it and in

favor of appellee Robert Mikles. Mikles was formerly the chief of police for the city from late August 2003 to November 2004 when he was terminated. Mikles sued the city in April 2004, first alleging breach of contract regarding his employment agreement with the city, and later amending the complaint to add an allegation of wrongful termination after he was fired.[1] The city moved for directed verdict at the appropriate times, which motions were denied. The jury found in his favor on both counts, awarding $5832 in damages for breach of contract and awarding $14,057.69 for wrongful termination, plus costs and attorney fees. The city moved for judgment notwithstanding the verdict, which was denied, and this appeal followed. Appellant contends on appeal that the jury's verdicts on breach of contract and on wrongful termination are not supported by substantial evidence. We reverse the verdict on breach of contract, and we affirm the verdict on wrongful termination.

Our standard of review of the denial of a motion for directed verdict is whether the jury's verdict is supported by substantial evidence. *Stewart Title Guar. Co. v. Am. Abstract & Title Co.*, 363 Ark. 530, 215 S.W.3d 596 (2005); *Ethyl Corp. v. Johnson*, 345 Ark. 476, 49 S.W.3d 644 (2001). Similarly, in reviewing the denial of a motion for judgment notwithstanding the verdict, we will reverse only if there is no substantial evidence to support the jury's verdict, and the moving party is entitled to judgment as a matter of law. *Id.* Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *Id.* It is not this court's place to try issues of fact; rather, this court simply reviews the record for substantial evidence to support the jury's verdict. *Id.* In determining whether there is substantial evidence, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.*

Appellant argues that (1) there is no substantial evidence to support the jury's finding that the city breached an employment contract with Mikles by ceasing to allow him permission to drive a city vehicle using the city's fuel and insurance, and (2) there is no substantial evidence to support the jury's finding that the city wrongfully discharged Mikles for filing suit against the city. To

---

[1] The mayor was also a named party because he was sued in his official capacity. However, for ease of reading, we refer only to the city as a named party and the primary appellant.

determine whether appellant's arguments hold any merit, we review the relevant testimony in the light most favorable to Mikles as the prevailing party.

Mikles, a man in his late fifties, testified that he was looking for a job when his wife found an advertisement seeking a chief of police in Huntington, a town about forty miles away from his residence in Magazine. Mikles contacted the mayor, Craig Cotner, and they met for an interview.

When they agreed that Mikles was suited for the job, they negotiated compensation. Mayor Cotner could not offer the per-hour pay rate that Mikles requested. Mikles asked if there was another means to add to the per-hour pay rate to compensate him, such as the use of a city vehicle to drive to and from home, with the attendant gasoline and insurance coverage provided by the city. This was important to Mikles, given the eighty-mile round-trip commute. The mayor agreed with the base hourly rate plus use of the city vehicle, subject to the city council's approval at the next meeting. Mikles's official hiring date was in late August 2003. Mikles drove his own vehicle to work for a couple of days, but shortly thereafter, he was given a city vehicle.

Mikles said he began work right away to slow down speeders driving through the middle of town on Highway 71 by writing warnings and citations; he arrested several drug manufacturers in the area; he started a youth program; he had offenders provide improvements to the jail facility; and he wrote two successful grant applications to acquire more equipment for police officers. The reviews of Mikles's performance were mixed: the mayor was pleased with the job being done, but a few city council members were not. Mikles said that the mayor "always backed me."

In March 2004, a city council meeting was convened, and councilman Parish moved to take the city car privilege from Mikles. The motion was seconded and approved in that meeting. Mikles was present, shocked, and had to get a ride home because the council's action took effect immediately. Councilman Rammings drove Mikles home that night. Mikles filed a breach of contract action in April 2004. Mikles said that relations with four of the six council members "really started to get bad" after he filed suit. Mikles said that the mayor was being pressured to fire him. Mikles did not want to quit, given that he enjoyed his job and was in his late fifties at the time.

On May 15, 2004, a city council meeting was conducted during which the sole issue was Mikles's lawsuit for breach of

contract. Councilman Bates moved that Mikles be suspended without pay until his lawsuit was resolved. The city attorney urged the council not to support that motion, and it was not seconded, such that the motion died. Mikles noted that during his tenure, the council overrode his decision regarding work schedules for himself and other officers. Mikles abided by the new schedule, despite it being "all these wild hours."

During the summer of 2004, Mikles terminated policeman Ryan Stephens from the force because the background check on Stephens indicated that he had a mental disorder. Mikles believed that Arkansas State Police protocol required termination for this reason. However, Mikles's decision to fire Stephens was not well received, especially by Stephens's wife, who was a councilwoman and one of the four councilpersons who were opposed to Mikles. Stephens appealed that decision and was ultimately returned to the force with back pay.

By October 2004, Mikles was of the impression that the mayor was "constantly upset . . . getting phone calls constantly from the city council, the same four, that he needed to get rid of me." At a meeting conducted on October 14, 2004, the council voted four-to-two to terminate Mikles. This had no effect because the council did not have the authority to hire and fire department heads; that authority rested with the mayor. After that meeting, the mayor told Mikles to take three weeks of accrued vacation and not come to town, during which the mayor urged Mikles to find another job. Mikles said he would look for another law-enforcement job, but if no job was available, he would not resign and would have to be fired to leave. When Mikles returned from vacation, the mayor told him he was fired. After that, Mikles added the allegation of wrongful discharge to his complaint. Mikles applied for and received unemployment benefits after his termination.

The mayor testified at trial on Mikles's behalf. He stated that he was the one who interviewed Mikles and negotiated the salary with the car allowance, agreeing that "that's what I offered him. He accepted it." The mayor remembered that it was several months later that the council voted to take the city vehicle away from Mikles. The mayor commented that the council had authority over the city's finances.

The mayor said that he was satisfied with Mikles's work and, if it were up to him, Mikles would probably still be the chief of police, though he agreed that Mikles was "hard-headed." The

mayor thought that the council members had personal vendettas against Mikles, in part because Mikles was a very assertive person. The mayor agreed that the council passed a motion to terminate Mikles's employment, but the motion was ineffective. This was in October 2004, after Mikles filed his lawsuit in April 2004. The mayor was very upset by the friction between Mikles and the council. The mayor acknowledged that the friction existed from the very beginning.

Steve Rammings, a councilman for six years, testified that he understood that the pay package for the chief of police was a salary and the city furnishing a car. Rammings was present for a city council meeting convened shortly after the mayor hired him where this was discussed, and Rammings believed that the city had an agreement with Mikles on those terms. Rammings said that in March 2004 when the car was taken away, the council acted in the absence of the city attorney, and it was a typical four-to-two vote. Rammings said that after the majority took the car away, he presented a motion to allow Mikles mileage, which was rejected. Rammings took Mikles home that night. Rammings believed that a month or two later, Mikles filed suit against the city. Rammings remembered that Melissa Stephens was on the council and that her husband was terminated by Chief Mikles. He believed that this was part of the animosity between her and Mikles. Rammings thought that Mikles did an excellent job as chief of police. Rammings knew that the city council was pressuring the mayor to fire Mikles, and he said that the four council members filed a frivolous lawsuit against the mayor, which was dropped after the mayor fired Mikles.

Motions for directed verdict regarding breach of contract and wrongful termination were denied. Councilman Parish testified that he did not understand that the council was agreeing to the full compensation package, but Parish conceded that no one objected to the terms at the next regular meeting after Mikles was hired. Parish thought that Mikles fired Officer Stephens shortly after Mikles came on the job and that he did not agree that Stephens should be fired for lack of information in his personnel file. Parish said that the council members received citizen complaints about Mikles, in part regarding the use of a city vehicle that was costing the townspeople. Parish said he was the one who made the motion to disallow Mikles the use of the vehicle because it was more expensive than he had originally thought when Mikles was hired. Parish believed that they made an alteration to his employ-

ment, which Mikles accepted by staying on the job. Parish was the one who made the motion to fire Mikles, which was passed by a majority vote, to show those council members' feelings about Mikles. Parish said the vote was a reaction to Mikles continuing to use the city vehicle on occasions when he had been disallowed that privilege.

Parish testified that he had crafted the city's employee handbook, and it specifically referred to at-will employment status. Parish believed that the car allowance had nothing to do with his employment status. However, Parish agreed that he had thought Mikles and the mayor had an agreement regarding the car, which the council ratified by not acting on that provision at the next council meeting after his being hired.

After renewed motions for directed verdict were denied, the trial judge instructed the jury. The jury was to determine whether a contract existed between the city and Mikles and whether it was breached. The jury was given definitions of contract, offer, acceptance, consideration, and modification. The judge told the jury that Mikles was an at-will employee, terminable at will by either party, except that if the discharge was based solely on filing a lawsuit, then that would be a violation of public policy. The jury found in favor of Mikles on both counts and awarded damages. The present appeal is before us for consideration.

Appellant first contends that there is no substantial evidence to support the jury's finding that the city breached a contract of employment by taking away privileges to use a city vehicle. Appellant acknowledges that there was an initial agreement to allow use of the city vehicle and that the city modified the terms of the agreement when it halted permission to use the vehicle in March 2004. Appellant contends that it unilaterally changed the terms of appellee's employment, which appellee accepted by staying on the job after the change was instituted. We are persuaded by this argument.

Appellant cites to *Crain Indus., Inc. v. Cass*, 305 Ark. 566, 810 S.W.2d 910 (1991). Our supreme court held in *Crain* that accepting changes in an employment agreement may constitute part of an altered agreement. The *Crain* opinion went on to state that an employee's retention of employment constitutes acceptance of the offer of a unilateral contract; the retention of employment being the necessary consideration to support the "new deal." *See id.* at 573. The problem with Mikles's proof was that even

though the compensation was agreed upon, it was not for a time certain. No doubt that an employee at will has a right to compensation upon the performance of services. *See Boatmen's Ark., Inc. v. Farmer*, 66 Ark. App. 240, 989 S.W.2d 557 (1999). The term or duration of the agreed-upon compensation was not part of the contract, and it was therefore subject to prospective alteration at any time. There is no substantial evidence to support the jury's verdict on the breach-of-contract claim. We reverse and dismiss the breach-of-contract verdict.

We next consider whether there was substantial evidence to support the jury's verdict that appellee Mikles was wrongfully discharged. The general rule is that "when the term of employment in a contract is left to the discretion of either party, or left indefinite, or terminable by either party, either party may put an end to the relationship at will and without cause." *Marine Servs. Unlimited, Inc. v. Rakes*, 323 Ark. 757, 763, 918 S.W.2d 132, 134-35 (1996) (quoting *City of Green Forest v. Morse*, 316 Ark. 540, 546, 873 S.W.2d 155, 158 (1994)). Stated another way, an employer may terminate the employment of an at-will employee without cause. *See Faulkner v. Ark. Children's Hosp.*, 347 Ark. 941, 69 S.W.3d 393 (2002); *Crain Indus., Inc. v. Cass*, 305 Ark. 566, 810 S.W.2d 910 (1991); *Gladden v. Ark. Children's Hosp.*, 292 Ark. 130, 728 S.W.2d 501 (1987). However, an at-will employee has a cause of action for wrongful discharge if he or she is fired in violation of a well-established public policy of the state. *Northport Health Svcs. v. Owen*, 356 Ark. 630, 158 S.W.3d 164 (2004). The public policy exception presents an exclusive contract cause of action. *See* Howard Brill, *Arkansas Law of Damages* (3d ed.) § 19-2; *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988). The exception is limited and not meant to protect merely private or proprietary interests. *Sterling Drug, Inc. v. Oxford, supra*. The burden of establishing a prima facie case of wrongful discharge is upon the employee, but once the employee has met his burden, the burden shifts to the employer to prove that there was a legitimate, nonretaliatory reason for the discharge. *Gen. Elec. Co. v. Gilbert*, 76 Ark. App. 375, 65 S.W.3d 892 (2002).

Mikles alleged that he was fired because he had filed suit for breach of contract, and therefore, his termination was solely in retaliation. The city responded that Mikles was an at-will employee subject to dismissal at any time for any reason, and further that there was no retaliatory reason for discharge. The jury was instructed that if the discharge was based solely on filing a lawsuit,

then that would be a violation of public policy.[2] There was no objection to this jury instruction. The jury found that Mikles had proven that he was fired in retaliation for his lawsuit.

■ The city argues that there is ample evidence of other reasons for Mikles's being terminated, unrelated to his filing a lawsuit. However, this is not the focus of appellate inquiry. We determine whether there was substantial evidence upon which the jury could base a decision that the reason for Mikles's termination was because he filed a lawsuit against the city. There was such substantial evidence, and therefore we affirm this point.

The jury verdict for breach of contract is reversed. The jury verdict for wrongful discharge is affirmed.

GLADWIN and BAKER, JJ., agree.

---

[2] The supreme court in *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988), held that an employer should not have an absolute and unfettered right to terminate an employee for an act done for the good of the public. No party challenged the trial court's rendering of a jury instruction that if Mikles was fired solely in retaliation for filing his lawsuit, this constituted a violation of public policy. While it would be for a jury to determine the reason for the plaintiff's termination, the question of whether the reason asserted by the plaintiff was in violation of a well-established public policy of the state is ordinarily a question of law for the court. *Koenighan v. Schilling Motors, Inc.*, 35 Ark. App. 94, 811 S.W.2d 342 (1991). We render no opinion on the legal soundness of this jury instruction regarding whether a violation of public policy occurred.