

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-15-207

| | |
|---|---|
| | **OPINION DELIVERED** OCTOBER 28, 2015 |
| TFS OF GURDON, INC.<br>APPELLANT | APPEAL FROM THE HOT SPRING COUNTY CIRCUIT COURT<br>[NO. 30 CV-11-289] |
| V. | HONORABLE EDDY ROGER EASLEY, JUDGE |
| KAY HOOK<br>APPELLEE | AFFIRMED |

## ROBERT J. GLADWIN, Chief Judge

This appeal arises from a wrongful-discharge suit. Appellee Kay Hook was discharged from her former employer, appellant TFS of Gurdon, Inc. (TFS). A Hot Spring County jury found in favor of Hook on her claim that she was discharged in violation of the public policy of Arkansas for complaining about and investigating suspected Medicaid fraud. TFS argues that there was insufficient evidence to support a verdict for wrongful discharge and the award of damages. We affirm on both points.

## I. *Statement of Facts*

Hook filed a complaint on December 15, 2011, alleging that she was hired by TFS as clinical director and was told that her job was to "keep Medicaid off [their] backs." She claimed that she realized this to mean that "she was expected to cover up for Medicaid fraud." Hook claimed that she found "suspicious" a TFS therapist's report that she spent five hours at a client's home for therapy and reported it to Abby Kyle, assistant to the CEO of

TFS, David Miller. She claimed that Kyle told her that the therapist complained of was "a big producer."

The complaint alleged that Hook complained to Kyle about Randy Green, another therapist, based on an allegation that Green reported that he had met with children when no children were in the clinic. She claimed that her request to see Green's billing was denied and that she was told to "back off looking into this therapist because he 'pays our paychecks.'" Hook also claimed that, in August 2011, she found that a child had gone missing, and she initiated the missing-child protocol. The child was later found at Magic Springs, where his therapy group had been taken earlier that day. She claimed that when the therapist, Green, turned in his logs for that day, the missing child was included for the time during which the child had been missing. She alleged that the child's name was then crossed off the logs, but she did not know if his name was on the ticket submitted to Medicaid.

Hook admits in her complaint that she scored poorly on her ninety-day review and was placed on ninety days' probation. She alleged that, during the meeting with Kyle to discuss the review, Kyle accused her of "targeting certain employees," which Hook claimed was a clear reference to her attempts to investigate potential Medicaid fraud. She further admitted that, during a staff meeting on November 9, 2011, she referred to the CEO, Miller, as "Mr. Abby." She claimed that she received text messages from Miller the next day that referred to her "targeting employees." She contended that this was another reference to her investigation of potential Medicaid fraud. On November 11, 2011, she was fired. She claimed that she was terminated in violation of public policy for complaining about and

investigating suspected Medicaid fraud. In her complaint, she asked for compensatory and punitive damages.

TFS denied her allegations and filed a motion for summary judgment, alleging that there were no genuine issues of material fact. Attached to its motion were several exhibits, including portions of depositions from Abby Kyle, David Miller, and appellee Kay Hook, an affidavit by Jane Sherrill, TFS's Corporate Compliance Officer, and Hook's termination letter. The termination letter states that Hook's ninety-day evaluation extended her probationary period for another ninety days, citing her poor communication skills with staff and school personnel. It also cited the "Mr. Abby" statement, characterizing it as gross misconduct, as the reason for her termination.

In Hook's deposition excerpt, she stated that she complained only to Kyle and Sherrill. Kyle testified in her deposition that Hook never came to her to complain about potential Medicaid fraud. In her affidavit, Sherrill stated that she never informed Miller about the complaints that Hook made to her about alleged Medicaid fraud. Sherrill stated that she investigated each complaint pursuant to her role as compliance officer, and she never found any evidence of Medicaid fraud. David Miller testified in his deposition that Hook alienated some of the schools that she worked with, overstepped her bounds by approving expenditures that were not in her purview, and called him "Mr. Abby" in a staffing. He denied that she ever came to him alleging Medicaid fraud among the therapists. He denied knowing if Hook went to anyone else with concerns regarding Medicaid fraud. He stated that the final reason for Hook's discharge was her "Mr. Abby" comment. He admitted

sending Hook text messages the day before she was discharged. One message stated, "Aside from pissing schools off, targeting certain employees and making comments about the CEO and administrative assistant, I would like to know what [Hook had to offer TFS]."

Also attached to the motion was Hook's ninety-day evaluation, given on September 13, 2011, which contained three satisfactory, two fair, and one poor-performance ratings. Under the additional comments, Kyle wrote,

> Your communication is extremely poor. You relay information to staff and "outside" individuals in a manner that they consider to be negative and demeaning. Your listening skills are ineffective as well because you do not follow through with information you are given. Your probationary period is extended for 90 more days from the date of this evaluation.

TFS argued in its summary-judgment motion that Hook could not establish that she had engaged in a protected activity because she had made complaints to the compliance officer, who investigated those complaints. TFS claimed that none of the complaints dealt with actual violations of state or federal law. It further alleged that, after Hook had been discharged, an anonymous caller reported TFS for suspected Medicaid fraud, and after a detailed audit, no Medicaid fraud was found. Also, TFS argued that Hook could not establish that Miller was aware of her reports of alleged Medicaid fraud. TFS asserted that, even if Hook had established a prima facie case, her claim should fail because TFS established a legitimate, nondiscriminatory reason for her termination, and she could not rebut that reason. Finally, TFS argued that her claim for back pay was precluded because she failed to accept the job she was offered within a week of her losing her position at TFS.

SLIP OPINION

Hook responded, denying that summary judgment was appropriate, and attaching her own affidavit, along with her and Kyle's deposition excerpts, the text messages between Hook and Miller, the ninety-day evaluation, and her termination letter from TFS. In her affidavit, Hook stated that she was told by Tonya Hunt, biller for TFS, and Kyle that Miller, whom they referred to as "Cuz," told her to "back off" when she complained of a therapist's billing sheets. She also stated that Kyle's attitude toward her changed after the ninety-day review, and Kyle began to instruct her to not visit certain clinics and to not check into things happening at these clinics. She stated that she felt she was being prevented from doing her job, and she became very concerned about suspected fraudulent and illegal billing practices. She stated that Sherrill told her that Sherrill could not afford to lose her job and was afraid of reporting TFS. Hook claimed that the position she was offered after she had been terminated was in Little Rock and, as a widowed single mother of two, the commute was too long, the company had recent problems with Medicaid, and the position paid $20,000 less per year than her position at TFS. She alleged in her response to summary judgment that material questions of fact remained regarding whether she had engaged in a protected activity, whether the "Mr. Abby" statement had been a pretext for her termination, and whether she had been diligent in her attempts to mitigate damages.

The trial court denied TFS's motion for summary judgment in a ruling made prior to the trial on Hook's claims. At trial, Nick Ward testified that he had been employed with TFS and was hired by Hook. He worked as a paraprofessional, helping to deliver therapeutic services. He said that he had concerns regarding billing practices at the Hot Springs location.

SLIP OPINION

SLIP OPINION

He explained that he would note the times for each client in a three-ring binder, initial it, and then turn in the note. He said that there were times when he found his time had been "whited out," and he would have to change his time if he wanted to get paid for it. He thought this was an unethical billing practice because Medicaid regulations stated that they were to "put exact times." He complained to Shannon Wynn, who was clinical director at the time, but she did not rectify the situation. When Hook took Wynn's place, the billing practices that concerned him stopped. He had a close working relationship with Hook, whom he described as good at communicating at staffing and with him. He said that he never saw any personality clashes or miscommunication with Hook and other staff members. He admitted on cross-examination that the "white out information" was not on time sheets submitted to Medicaid and that he did not know what went to Medicaid. He said that he thought the practice was Medicaid fraud, and he reported it to the clinical director.

Kay Hook testified, expounding on the statements she attested to in her affidavit and those made in her deposition testimony. She explained that the "Mr. Abby" comment was made in a joking manner, and that she immediately apologized for it. She said that she meant the statement to be a joke and that the other staff members thought it was a joke, and they laughed.

TFS moved for a directed verdict, arguing that Hook failed to produce any evidence of Medicaid fraud. Counsel argued, "They put in evidence that she made reports, but the evidence indicates clearly that she was fired for her statements, and even she admits that her statements were inappropriate." Hook's counsel responded that the text messages suggest

targeting of certain employees was a factor in her termination. The trial court denied the directed–verdict motion, stating that it was a question for the jury.

Kyle, Miller, and Green testified on behalf of TFS. Following the testimony, the trial court considered jury instructions, rejecting TFS's request to instruct the jury that Hook had to prove that she had made a report to Medicaid, that TFS knew that she had made a report to Medicaid, and that TFS had fired her for reporting to Medicaid. The trial court also denied TFS's request to instruct the jury that if it found that TFS did not commit the alleged fraud complained of by Hook, the verdict must be for TFS. Finally, TFS's request for the jury to be given a verdict form that found TFS did or did not commit fraud was denied.

Following Sherrill's testimony, TFS again moved for a directed verdict, arguing that there was insufficient evidence to find for Hook. Counsel for Hook argued that there was enough evidence that Hook made the reports, that "they" had knowledge of the reports, and that a reasonable jury could find that "it was the primary motivating factor in her termination." The trial court denied the motion.

After rebuttal testimony given by Hook, TFS renewed its motion for a directed verdict, and the trial court denied the renewed motion. On October 10, 2014, the jury returned a verdict for Hook, awarding damages in the amount of $50,000. TFS moved to set aside the verdict based on insufficient evidence. The trial court denied the motion.

On October 17, 2014, TFS filed a motion for new trial under Arkansas Rule of Civil Procedure 59(a) (2014), arguing that the jury's verdict was clearly against a preponderance of the evidence, the jury's damages award was clearly against the preponderance of the

evidence, the damages award was excessive and given under the influence of passion or prejudice, and the award of damages was too large. Also on that day, TFS filed a motion for judgment non obstante veredicto pursuant to Arkansas Rule of Civil Procedure 50 (2015), asking that the verdict be set aside because the law framed to the jury was improper and created an unjust result. The trial court denied both motions by order filed November 10, 2014, finding that there was sufficient evidence to sustain both the verdict on liability and the amount of damages awarded. The trial court also found that the jury had been presented with the proper law. On November 10, 2014, the trial court granted Hook judgment against TFS on her wrongful-discharge claim in the amount of $50,000. A timely appeal was filed on November 14, 2014, and this appeal filed by TFS followed.[1]

## II. *Standard of Review*

Our standard of review of the denial of a motion for a directed verdict is whether the jury's verdict is supported by substantial evidence. *City of Huntington v. Mikles*, 96 Ark. App. 213, 240 S.W.3d 138 (2006). Similarly, in reviewing the denial of a motion for judgment notwithstanding the verdict, we will reverse only if there is no substantial evidence to support the jury's verdict, and the moving party is entitled to judgment as a matter of law.

---

[1]On November 19, 2014, Hook filed a motion for attorney's fees, seeking $31,445.13, combined with a motion to strike the notice of appeal as premature. TFS filed a response, objecting. By order filed January 30, 2015, the trial court granted Hook attorney's fees and costs in the amount of $25,165, pursuant to Arkansas Code Annotated section 16-22-308 (Repl. 1999) and *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988). The portion of the motion pertaining to striking the notice of appeal was dismissed by agreement of the parties. TFS's notice of appeal was not amended to include the order awarding attorney's fees. An order not mentioned in a notice of appeal is not properly before this court. *See Midyett v. Midyett*, 2013 Ark. App. 597, at 6.

*Id.* Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *Id.* It is not this court's place to try issues of fact; rather, this court simply reviews the record for substantial evidence to support the jury's verdict. *Id.* In determining whether there is substantial evidence, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.*

### III. *Sufficiency of the Evidence for Wrongful Discharge*

First, TFS contends that there was insufficient evidence to render a verdict for Hook on her wrongful–discharge claim in violation of public policy.

> [A]n employer may terminate the employment of an at–will employee without cause. *See Faulkner v. Ark. Children's Hosp.*, 347 Ark. 941, 69 S.W.3d 393 (2002); *Crain Indus., Inc. v. Cass*, 305 Ark. 566, 810 S.W.2d 910 (1991); *Gladden v. Ark. Children's Hosp.*, 292 Ark. 130, 728 S.W.2d 501 (1987). However, an at–will employee has a cause of action for wrongful discharge if he or she is fired in violation of a well-established public policy of the state. *Northport Health Svcs. v. Owens*, 356 Ark. 630, 158 S.W.3d 164 (2004). The public policy exception presents an exclusive contract cause of action. *See* Howard Brill, *Arkansas Law of Damages* (3d ed.) § 19-2; *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988). The exception is limited and not meant to protect merely private or proprietary interests. *Sterling Drug, Inc. v. Oxford, supra.* The burden of establishing a prima facie case of wrongful discharge is upon the employee, but once the employee has met his burden, the burden shifts to the employer to prove that there was a legitimate, nonretaliatory reason for the discharge. *Gen. Elec. Co. v. Gilbert*, 76 Ark. App. 375, 65 S.W.3d 892 (2002).

*Mikles*, 96 Ark. App. at 219, 240 S.W.3d at 143.

TFS argues that Hook was not able to establish a prima facie case because she did not establish that (1) she was engaged in any protected activity; (2) the decision maker was aware of her complaints, whether protected or not; or (3) there was any relationship between the

9

complaints and her termination from employment. Regarding the protected activity, TFS contends that Hook must have proved to the jury that TFS was in violation of the law in order to prevail. For this theory, it cites *Singley v. USFilter Recovery Services*, 395 F. Supp. 2d 758 (E.D. Ark. 2005) (where alleged termination of an employee for voicing complaints about the environmental condition of a facility on multiple occasions did not fall under Arkansas's public-policy exception to the general at-will employment rule, absent proof that he reported conduct that violated federal or state law), and *Skrable v. St. Vincent Infirmary*, 57 Ark. App. 164, 943 S.W.2d 236 (1997) (where this court held that the termination of an employee who divulges or threatens to expose mere deficiencies in an employer's performance of its contractual obligations does not offend public policy).

However, we agree with Hook's contention that there is no precedent for the argument that an employee in a wrongful-discharge claim must also prove an actual violation of law in addition to proving that she was terminated for reporting suspected violations of law. Neither *Singley*, *supra*, nor *Skrable*, *supra*, hold that an employee making a wrongful-discharge claim has to prove an actual violation of law; rather, they both hold that an employee making such a claim must prove that she reported a violation of law. In both cases, the reported conduct, even if true, would not have been a violation of law. *See Singley*, *supra*; *Skrable*, *supra*.

TFS also argues that whether a termination decision was a violation of a well-established public policy of the state is a question of law because the jury is not equipped to research the statutes in order to determine public policy. *Koenighain v. Schilling Motors, Inc.*,

35 Ark. App. 94, 811 S.W.2d 342 (1991). TFS claims that the trial court erred by letting the jury determine the issue of whether the public policy of Arkansas was violated. Again, we agree with Hook that TFS's claim is inaccurate. A public-policy-discharge action is predicated on the breach of an implied provision that an employer will not discharge an employee for an act done in the public interest. *Oxford*, *supra*. The public policy of the state is contravened if an employer discharges an employee for reporting a violation of state or federal law. *Id*. By denying the motion for summary judgment, the trial court, not the jury, made the determination that, if Hook's allegations were accepted as true by the jury, she had made a report of suspected illegal activity and could have a valid claim for wrongful termination in violation of public policy.

Alternatively, TFS submits that Hook must prove that she had an objectively reasonable basis to believe that TFS violated the law. TFS asserts the following: Hook admitted at trial that she never saw what was actually submitted to Medicaid; TFS had never been sanctioned by Medicaid for fraud; Hook's witness, Nick Ward, testified that all unfair billing practices that he was aware of actually stopped after Hook took over as clinical director; and an audit by Medicaid after Hook was discharged found no fraud. TFS seems to contend that, because there was no violation of law found, public policy is not offended, and Hook had no basis for a claim for wrongful discharge. For this argument, TFS cites a case from Missouri, *Bazzi v. Tyco Healthcare Group*, 652 F.3d 943 (8th Cir. 2011) (citing *Margiotta v. Christian Hosp. Ne. Nw.*, 315 S.W.3d 342 (Mo. 2010)). TFS claims that, because Hook points to no specific law that was violated, any internal reports made by her are

SLIP OPINION

SLIP OPINION

governed by the at–will employment doctrine, not by the narrow public-policy exception.

However, TFS misinterprets *Bazzi*, *supra*, because the case does not state that plaintiffs are required to prove an actual violation under Missouri law. The case states that a plaintiff making a wrongful-discharge claim must show only a good-faith, objectively reasonable belief that his former employer was violating public policy, not prove an actual violation. *Bazzi* at 948.

Second, TFS claims that a new trial should be granted because the trial court rejected its proposed jury instruction on the elements of a wrongful discharge. TFS's proffered instruction contained the element that Hook had to prove an actual violation of law to succeed on her claim. However, as stated above, there is no precedent requiring an actual violation of law to be found; rather, reporting a suspected violation of law is enough. Because Arkansas law does not require an actual violation of law for a wrongful-discharge claim in violation of public policy, TFS's proposed instruction was improper.

Third, TFS argues that Hook cannot establish that Miller was aware of her complaints. Miller swore under oath that he was the only decision maker in her termination. Kyle testified that Miller was the sole decision maker in Hook's termination. Miller also testified that he was unaware of Hook's internal complaints. Sherrill testified that she never told Miller about Hook's concerns. Thus, TFS contends that there was no causal connection to support the jury verdict of wrongful discharge. *See Jackson v. United Parcel Serv., Inc.*, 548 F.3d 1137 (8th Cir. 2008) (holding no causal connection existed where the decision makers were unaware of EEOC charges when they made the adverse employment decision).

12

In contrast, Hook contends that she established that Miller was aware of her complaints of suspected Medicaid fraud. She testified that Miller was directly aware of her complaints because she personally spoke with him about therapists "whiting out" therapy times on handwritten notes. She also testified that, when she became suspicious of Green's billing activities, she reported this to Kyle, Miller's assistant, and on two occasions, Kyle told her that Miller had said to "back off" her attempts to investigate the therapist. Also, Hook cites the text message from Miller in which he claimed that she targeted certain employees. Hook claims that this text was a clear reference to her complaints about, and attempts to look into, the billing practices of Green.

The jury is the sole judge of the credibility of the witnesses and of the weight and value of their evidence. *Wallis v. Keller*, 2015 Ark. App. 343, at 4, 464 S.W.3d 128, 131. It may believe or disbelieve the testimony of any one or all of the witnesses, though such evidence is uncontradicted and unimpeached. *Id.* Accordingly, based on Hook's testimony and the supporting evidence she presented, the jury was able to determine that a causal connection existed to support the wrongful discharge.

Fourth, TFS contends that it proved legitimate, nondiscriminatory reasons for Hook's discharge. *See Wingfield v. Contech Constr. Prods., Inc.*, 83 Ark. App. 16, 115 S.W.3d 336 (2003) (the burden of establishing a prima facie case of wrongful discharge is upon the employee, but once the employee has met its burden, the burden shifts to the employer to prove that there was a legitimate, nonretaliatory reason for the discharge). TFS claims that Hook presented no evidence to refute its reason for her termination. It argues that Miller

13

was free to conclude that Hook's insubordination had reached a level where the relationship with TFS needed to be severed. Hook admitted that her "Mr. Abby" comment was inappropriate.

Hook maintains that she proved that the reasons given for her termination were pretextual and that her complaints of suspected fraud were the primary motivating factor for her termination. There was evidence that she was told to "back off." She contends that the characterization of the "Mr. Abby" joke as "gross misconduct" suggests that TFS was looking for any pretextual reason to justify terminating her. Finally, she claims that Miller's reference to her targeting employees is substantial evidence to support the jury's verdict. We hold that, when viewed in the light most favorable to Hook, the evidence she presented was sufficient to allow the jury to determine that she was wrongfully discharged and that TFS's stated reasons for her termination were pretextual.

IV. *Sufficiency of Evidence to Support Damages Award*

First, TFS argues that the damages awarded were based on speculative calculations. It submits that Hook was granted an excessive jury award and that there was insufficient evidence submitted at trial to support the jury's award. TFS contends that, had Hook accepted the job she was offered in Little Rock, her annual difference in pay between the Little Rock job and her prior TFS position would have been $20,000 annually. Thus, over the three-year period between her termination and trial, Hook would have earned $60,000 less than she earned in her new positions. Thus, TFS claims that the $50,000 award was speculative. Second, TFS argues that Hook failed to mitigate her damages because she did

not take the similar job that was offered to her in Little Rock almost immediately after her discharge from TFS. A discharged employee must mitigate her damages by seeking substantially equivalent work. *Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982).

The proper measure of damages in a public-policy wrongful-discharge action is the sum of lost wages from termination until day of trial, less the sum of any wages that an employee actually earned or could have earned with reasonable diligence; additionally, an employee may recover for any other tangible benefit lost as a result of the termination. *Gen. Elec. Co. v. Gilbert*, 76 Ark. App. 375, 385, 65 S.W.3d 892, 900 (2002). The party asserting entitlement to damages has the burden to prove the claim. *Id*. Damages must not be left to speculation and conjecture. *Id*.

The evidence presented was that Hook earned about $6000 per month working for TFS. She also said that she had earned about $100,000 from the time of her termination in November 2011 until the trial in October 2014. If she had remained at her job as clinical director, she would have earned about $210,000 during this same time period. Therefore, the jury had sufficient evidence to award her up to $110,000 in lost wages. Hook claims that she did meet her duty to mitigate her damages because the job offered to her immediately after her termination was not substantially equivalent to her job with TFS. The salary was $20,000 less per year, and it would have required her to commute two hours each day for work. We hold that there was sufficient evidence for the jury to determine that Hook met her duty to mitigate her damages and to award her damages in the amount of $50,000 without resorting to speculation.

Affirmed.

HARRISON and GRUBER, JJ., agree.

*The Lancaster Law Firm, PLLC*, by: *Clinton W. Lancaster* and *Angela Echols*, for appellant.

*Nicholas R. Windle*, for appellee.